IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

RAMINDER KAUR,            *

     Petitioner           *

v.                   *       Civil Action No. GLR-21-1780

ROBERT L. GREEN et al.,     *

     Respondents.       *
                      ***

**MEMORANDUM OPINION**

THIS MATTER is before the Court on Petitioner Raminder Kaur's Petition for Writ of Habeas Corpus. (ECF Nos. 1, 3). The matter is ripe for review, and no hearing is necessary. See R. Govern. § 2254 Cases U.S. Dist. Ct. 8(a); 28 U.S.C. § 2254(e)(2); Local Rule 105.6 (D.Md. 2023); see also Fisher v. Lee, 215 F.3d 438, 455 (4th Cir. 2000) (noting that petitioners are not entitled to a hearing under 28 U.S.C. § 2254(e)(2)). For the reasons outlined below, the Petition will be dismissed, and the Court will issue a certificate of appealability on one of Kaur's claims.

## I.   BACKGROUND

### A.   First Trial

On November 22, 2013, Kaur was indicted in the Circuit Court for Montgomery County on charges related to the murder of Preeta Gabba. (Supp. Habeas Pet. at 13, ECF No. 25).[1] The state prosecution team consisted of Marybeth Ayres and Jessica Hall. (Id. at

---

[1] Citations to page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

106). Kaur was represented by Alan Drew from the Maryland Office of the Public Defender. (Id.). After a trial by jury held July 29, 2014–August 6, 2014, Kaur was convicted of first degree murder, conspiracy to commit first degree murder, and use of a handgun in a crime of violence. (Aug. 7, 2014 Transcript at 28–29, ECF No. 25-10).

The Appellate Court of Maryland ("Appellate Court") described the factual background as follows:[2]

> Preeta Gabba was shot three times at close range, resulting in her death, while walking in Germantown, Montgomery County, at about 7:45 on the morning of October 12, 2013. Her former husband, Baldeo Taneja, and his wife, Raminder Kaur, were charged in Gabba's murder. They were tried together and convicted by a jury of first-degree premeditated murder, conspiracy to commit first-degree premeditated murder, and use of a handgun in the commission of a felony.
>
> The State's theory of prosecution was that Taneja and Kaur conspired to kill Gabba, and that it was Kaur who fired the fatal shots. The State's case was largely circumstantial and centered on motive and opportunity. The State produced evidence that the gun used to kill Gabba was found in the rear seat of Taneja and Kaur's car 30 hours after the murder, and that Taneja had purchased the gun five weeks earlier. The defense argued lack of criminal agency and, more particularly, that others had motive to kill Gabba . . .
>
> Gabba and Taneja were married in India in 2002 and continued to live there for several years. In 2006, Taneja moved to the United States; Gabba followed in 2009. They lived in the Germantown area, but not together. Two years later, Gabba and Taneja divorced, and soon afterward Taneja married Kaur and moved to Nashville, Tennessee. Gabba remained in the Germantown area[.]

---

[2] The Appellate Court adopted the facts as described in Taneja v. State, 149 A.3d 762 (Md.Ct.Spec.App. 2016).

On the morning of Gabba's murder, she was en route to her job, walking from her home to the bus stop, as she had done regularly for the preceding three years. Three eyewitnesses testified to the events at the murder scene.

[A woman] was driving her teenage son to his school in the 19700 block of Crystal Rock Drive, a residential area, when they heard several gunshots. [The woman] slowed her car and saw two women ahead of her. One of the women, later identified as Gabba, started crossing the street in the middle of the block, while the other woman was close behind her. As Gabba fell into the street in front of [the witness's] car, the second woman ran away. [The witness] and her son described the woman who ran away, in part, as wearing a bright orange scarf. They initially described both women as African-American, although, at trial, both were less positive about their race. Neither saw anyone else in the immediate area at the time.

A man living in an apartment about 100 yards from where the shooting occurred testified that he heard gunshots and looked out his window. He saw a woman, later identified as Gabba, lying on the ground, and ten feet away another woman, who exhibited a slight limp, was running away. The witness described the woman who was running away as in her late 40's or early 50's with "brownish" skin color and wearing a bright head scarf. Like the [driver and her son], he initially told the police that the woman was African–American, but, at trial, was less positive of her race.

Suspicion quickly fell on Taneja and Kaur. Several hours after the murder, around 3:30 p.m., Montgomery County Police Department homicide detectives called Taneja's cell phone, but it went directly to voice mail, as did several additional calls. Warrants were obtained for Taneja and Kaur, who were arrested in Tennessee around 2:00 p.m. the day following the murder, as they were driving away from their home. One of the detectives observed that Kaur walked with a limp.

The police searched the car and recovered a backpack containing a wig, black hair dye, a black hoodie, and a plastic bag. In the plastic bag was a .357 Ruger LCR revolver, which later testing and examination determined to be the murder weapon. The plastic bag also contained a holster for the .357

Ruger, and a 100 Ruger revolver. Inside Kaur's purse the police found a note in her handwriting that read: "You calm down. We are now in Tennessee near my home." A global positioning system device (GPS) was recovered from the front console of the car. Inside Taneja's wallet was a piece of paper on which Kaur had written Gabba's address.

A search of Taneja's residence recovered documents with a note on top in Kaur's handwriting that read, "Dragon story and other court documents." The police also recovered a composition notebook with different handwriting that read, in part, "No brass, no evidence."

Two firearm and tool mark identification experts testified that the three bullet specimens recovered from Gabba's body were all fired from the .357 Ruger LCR revolver that was recovered from Taneja's car. Taneja's DNA was found on both guns seized from his car.

The State also presented evidence to support its theory of Taneja's and Kaur's motive to kill Gabba, including that, in 2009, when Gabba moved to the United States from India, Taneja and Gabba were experiencing marital discord. While Gabba lived in a condominium in Germantown with one of Taneja's sons, Taneja and Kaur lived nearby and held themselves out as husband and wife.

In 2010, Gabba and Taneja began divorce proceedings, which became "very contentious" even though they had little property and no children together. The State introduced evidence that during the divorce proceedings, Taneja asked his son and Kaur to spy on Gabba, and that Taneja referred to Gabba as "Dragon Lady," as did his son and Kaur. At one point during the divorce proceedings, Gabba, acceding to Taneja's demand, left the family home. She later returned, pursuant to a court order, to find that Taneja had erected walls, so she had access only from the entry door to her bedroom.

The State presented evidence that, although the divorce became final in July 2011, Taneja failed to honor their divorce agreements, and their interactions continued to be acrimonious. Indeed, at the time of Gabba's murder, Taneja still had not

transferred their property in India as required by the divorce settlement, despite several requests by Gabba.

Additional evidence was offered by the State relating to Taneja's [obligation] to pay alimony in the amount of $2,400 each month for three years. Alimony was to terminate upon the death of either party. By February 2013, Taneja had fallen three months behind in his alimony obligation, prompting Gabba to send several demands for payment, via e-mail. Eventually, her attorney filed a contempt petition against Taneja who, in response, filed a counterclaim for $100,000. The contempt hearing was scheduled for October 10, 2013, two days before the murder, but several days before the hearing, their attorneys negotiated an agreement whereby Taneja agreed to pay the arrears within 90 days. The State also presented evidence of Taneja's and Kaur's opportunity to kill Gabba.

About five weeks before Gabba's murder, Taneja attended a day-long gun training class in Tennessee. The class included four hours of instruction and four hours of shooting range experience that would allow him to obtain a "handgun carry permit." In his testimony, the instructor recalled that, at the first class, Taneja entered the classroom with a woman and sat in the last row. When the woman was asked to leave because she had not paid to attend the class, Taneja moved to the first row. The instructor particularly remembered Taneja because he took "a ton of" notes. Among the instructor's recommendations to the class participants was that they purchase a revolver rather than a semiautomatic, because the latter requires much more training for accuracy than a revolver. He further remembered telling the class that a semiautomatic "spits out" shell casings that can later be matched to the gun, but a revolver does not.

On September 28, 2013, two weeks before the murder, Taneja purchased two revolvers from a gun store in Tennessee: a .357 Ruger LCR, which was described as a snub-nosed revolver designed with a "concealed hammer" so it would not get hung up on clothing, and a 100 Ruger GP. Additionally, Taneja purchased a holster for the .357 and ammunition for both guns. Kaur was present in the store when Taneja purchased those items.

Around 7:00 p.m. on October 11, the night before the murder, Taneja and Kaur checked into the Red Roof Inn in Germantown, about eight miles from where Gabba was shot. From the GPS recovered from Taneja's car, the police learned that at 9:58 a.m. the next morning—October 12—the GPS device traveled toward the District of Columbia.

The evidence disclosed that both Taneja and Kaur were involved in Amway distribution and sales, Taneja since the early 1990's. On the weekend of October 11–13, 2013, Amway held a "Free Enterprise" weekend conference at the Washington Hilton, involving thousands of Amway members. The event started Friday night at 6:00 p.m. and lasted until Sunday at 3:45 p.m. Taneja's Amway sponsor testified that Taneja was aware of the importance of attending the conference.

At 10:44 a.m. on the morning of the murder, Taneja purchased two tickets for the conference. About 30 minutes later, the GPS revealed a stop near the Washington Hilton, a distance of about 19 miles from the Red Roof Inn. At 11:37 a.m., Taneja and Kaur entered the conference, where they were seen by Taneja's Amway sponsor and his wife shortly after they arrived. A short time later the sponsor texted Taneja, inviting him and Kaur to join their group for lunch. Taneja texted back that he could not make it because Kaur was not feeling well. The sponsor's wife testified that Kaur had not appeared unwell when she had seen her earlier. From the GPS device, the police determined that Taneja and Kaur attended the three-day event for less than an hour, leaving the D.C. area shortly after noon. Their car continued westward, stopping in Farragut, Tennessee around midnight. Their travel resumed the following morning around 9:30 and concluded at their home about noon.

Kaur v. State, No. 2516, 2016, 2019 WL 2407997, at *2–4 (Md.Ct.Spec.App. 2019).

Shortly after the verdict, Kaur filed a motion for a new trial, arguing inter alia, that her trial counsel was ineffective for deceiving her into believing that she could not testify in her own defense. (Answer Resp. Habeas Pet. at 3–8, ECF No. 23; Supp. Habeas Pet. at 111–129). In response, the state issued subpoenas for the defense team's entire file.

6

(Answer Resp. Habeas Pet. at 139–152). The trial court overruled Kaur's objection to the subpoenas, finding that Kaur's allegations of ineffective assistance of counsel were broad enough to entitle the state to the entire defense file. (Feb. 25, 2015 Tr. at 7–8n ECF No. 25-11).

The trial court held hearings on Kaur's motion for a new trial on July 13–17, 2015, August 3–4, 2015, and August 14, 2015. (ECF Nos. 23-2, 23-3, 23-4, 23-5, 23-6, 23-7, 23-8, 23-9). The trial court heard testimony from fifteen witnesses, including Raminder Kaur and her trial counsel, Alan Drew. (See id.). On November 6, 2015, the trial court granted Kaur's motion for a new trial based on her claim that Alan Drew advised her that she could not testify in her own defense because of the martial privilege. (Nov. 6, 2015 Tr. at 15, ECF No. 23-10).

Following the ruling, Kaur sought a protective order prohibiting the state from using privileged information at the retrial and barring the prosecution team that had access to her privileged information from participating in her retrial. (State R. App. Vol. 2 at 9–35, ECF No. 25-1). The trial court granted the protective order in part. (April 14, 2016 Tr. at 9–10, ECF No. 23-11). The protective order prohibited the state from using privileged communications but did not prohibit the original prosecution team from participating in the retrial. (Id.).

## B.   **Second Trial**

A second jury trial was held November 1–9, 2016. (ECF Nos. 25-13, 25-14, 25-15, 25-16, 25-17, 25-18, 25-19). The state was again represented by Marybeth Ayres and Jessica Hall. Kaur's new counsel was Sam Davidoff, Colette Connor, and Michael

Goldsticker. (Id.). Kaur was convicted for a second time of first degree murder, conspiracy to commit first degree murder, and use of a handgun in a crime of violence. On January 23, 2017, the trial court sentenced Kaur to life imprisonment. (Jan. 23, 2017 Tr. at 6–24, ECF No. 25-20).

## C.   <u>Direct Appeal</u>

Kaur initiated a direct appeal with the Appellate Court, asserting two assignments of error: (1) the trial court erred in allowing the retrial to be litigated by a prosecution team with extensive knowledge of privileged information, and (2) the trial court abused its discretion in excluding the testimony of her expert in eyewitness identification, Dr. Kovera. (Appellant's Br. at 8–9, ECF No. 3-9). In a lengthy opinion issued on June 7, 2019, the Appellate Court affirmed Kaur's conviction and sentence. <u>Kaur</u>, 2019 WL 2407997, at *2–4.

Kaur filed a petition for a writ of certiorari with the United States Supreme Court, (State R. App. Vol. 2 at 188–211), and the state filed a conditional cross-petition, (<u>Id.</u> at 215, 222–224). The Supreme Court denied Kaur's petition with an accompanying statement from Justice Sotomayor expressing an opinion that, "the criminal justice system failed to live up to its highest ideals." <u>Kaur v. Maryland</u>, 141 S.Ct. 5–7 (2020). Specifically, Justice Sotomayor expressed three concerns:

> First, it is deeply disconcerting that the State has suggested that defendants who raise ineffective-assistance-of-counsel claims during the trial phase must forfeit their right to privileged communications with counsel . . . Second, this case demonstrates the many insidious ways that potential Sixth Amendment violations can affect the course of a trial . . . Kaur's concern that the State might use her privileged

8

information for its own advantage was hardly hypothetical: One of the prosecutors had, in fact, already informed the court that she had taken the opportunity to "scour" Kaur's defense file and that she had "made a list of all the negatives that [would] befall the defendant" should she choose to testify. It would be an impossible task for any court, no matter how diligent, to identify and assess all potential sources of prejudice simply by comparing the records of two trials . . . Finally and crucially, the decision whether to allow the original prosecution team to retry Kaur was not the court's alone to make. The prosecutors, too, had a choice. And in making that choice, as with all prosecutorial decisions, those lawyers acted as "the representative[s] not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." Berger v. United States, 295 U.S. 78, 88 (1935).

Id.

## D.   **Federal Habeas Petition**

In her Petition for federal habeas relief, Kaur brings two claims for relief: (1) her right to counsel under the Sixth and Fourteenth Amendments was violated when her second trial was conducted by prosecutors with full knowledge of her attorney-client privileged communications and attorney work product, and (2) her rights to due process and to present a defense under the Sixth and Fourteenth Amendments were violated when the trial court improperly prevented her from offering expert testimony. (Pet. Writ Habeas ["Pet."] at 10, ECF No. 3).

Respondents filed an Answer to the Petition and a Sur-Reply, contending that Claim One lacks merit and Claim Two is procedurally defaulted. (ECF Nos. 23, 32). Kaur filed a Reply, and a Response to the Respondents' Sur-Reply. (ECF Nos. 27, 37).

Respondents also filed a Motion to Strike attachments to Kaur's petition, claiming they were not part of the state court record and are not to be considered on federal habeas review per Cullen v. Pinholster, 563 U.S. 170 (2011). (ECF No. 8). The Court denied Respondents' Motion to Strike, deferring a ruling until a merits' consideration. (ECF No. 20). The Court subsequently ordered the Respondents to supplement the record with the exhibits entered into evidence at the hearings on Kaur's motion for a new trial. (ECF No. 42). Respondents complied with the Order, (ECF No. 43), and Kaur filed a memorandum explaining which of the state court exhibits were attached to her habeas corpus petition, (ECF No. 46).

## II.     MOTION TO STRIKE

By its plain terms, § 2254(d)(2) limits [federal habeas review] to the evidence placed before the state [] court. Elmore v. Ozmint, 661 F.3d 783, 850 (4th Cir. 2011), as amended (Dec. 12, 2012), citing Cullen, 563 U.S. 170. The Court deferred ruling on the Respondents' Motion to Strike, recognizing an exception to Pinholster when a federal habeas court determines that the state court's adjudication was contrary to federal law, and the state court record was underdeveloped. (March 29, 2022 Mem. Op. at 5, ECF No. 19). As explained below, the Appellate Court of Maryland's decision denying Kaur's claims was not contrary to federal law, and thus the Court's review is limited to the state court record.

Accordingly, in addressing Kaur's claims on the merits, the Court has only considered the documents and testimony that were presented by Kaur during state court proceedings. This includes the portions of the state court record originally filed by the state

(ECF No. 23-1 through 23-11; ECF No. 25-1 through 20) and the supplemental materials that comprise the exhibits submitted at the hearings on Kaur's motion for a new trial (ECF No. 43-1 through 43-3).

## III.   DISCUSSION

### A.   <u>Procedural Default</u>

Before seeking review under 28 U.S.C. § 2254, a person in custody must exhaust remedies available in state court by presenting each claim to the appropriate state court. A claim is procedurally defaulted when a petitioner has failed to present the claim to the highest state court with jurisdiction to hear it, whether it be by failing to raise the claim in post-conviction proceedings or on direct appeal, or by failing to timely note an appeal. <u>See</u> <u>Coleman v. Thompson</u>, 501 U.S. 722, 749–50 (1991) (failure to note timely appeal); <u>Murray v. Carrier</u>, 477 U.S. 478, 489–91 (1986) (failure to raise claim on direct appeal); <u>Murch v. Mottram</u>, 409 U.S. 41, 46 (1972) (failure to raise claim during post-conviction proceedings); <u>Bradley v. Davis</u>, 551 F.Supp. 479, 481 (D.Md. 1982) (failure to seek leave to appeal denial of post-conviction relief).

A federal habeas court may consider only those issues which have been "fairly presented" to the state courts. <u>Picard v. Connor</u>, 404 U.S. 270, 275–76, (1971). Although the claims presented need not be "identical," <u>see</u> Ramdass <u>v. Angelone</u>, 187 F.3d 396, 409 (4th Cir. 1999), the petitioner must present the "'substance' of his federal habeas corpus claim." <u>Anderson v. Harless</u>, 459 U.S. 4, 6 (1982) (per curiam) (quoting <u>Picard</u>, 404 U.S. at 278). Presenting the "substance" of the claim requires that the claim "be presented face-up and squarely; the federal question must be plainly defined.

Oblique references which hint that a theory may be lurking in the woodwork will not turn the trick." Mallory v. Smith, 27 F.3d 991, 995 (4th Cir. 1994) (quoting Martens v. Shannon, 836 F.2d 715, 717 (1st Cir. 1988)). In other words, fair presentation contemplates that "both the operative facts and the controlling legal principles must be presented to the state court." Baker v. Corcoran, 220 F.3d 276, 289 (4th Cir. 2000) (internal quotations omitted).

A procedural default may also occur where a state court declines "to consider the[] merits [of a claim] on the basis of an adequate and independent state procedural rule." Yeatts v. Angelone, 166 F.3d 255, 260 (4th Cir. 1999). As the United States Court of Appeals for the Fourth Circuit has explained, "if a state court clearly and expressly bases its dismissal of a habeas petitioner's claim on a state procedural rule, and that procedural rule provides an independent and adequate ground for the dismissal, the habeas petitioner has procedurally defaulted his federal habeas claim." Breard v. Pruett, 134 F.3d 615, 619 (4th Cir. 1998). Under Maryland law, "an allegation of error is waived when a petitioner could have made, but intelligently and knowingly failed to make the allegation . . . in a prior [post-conviction] petition." Md. Code Ann., Crim. Proc. § 7-106(b)(1)(i). A rebuttable presumption exists that this waiver was knowing and intelligent. Id. § 7-106(b)(2).

Respondents contend that Claim Two is unexhausted and procedurally defaulted because it was not fairly presented to the state court as a constitutional claim. (Answer Resp. Pet. Writ. Habeas at 73). Indeed, in her brief to the Appellate Court, Kaur solely argued that the trial court erred in striking Dr. Kovera's testimony because it violated

Maryland's evidence rules and precedent interpreting those rules. (Appellant's Br. at 32–39). Kaur made no argument that her constitutional rights were violated when the trial court refused to permit Dr. Kovera's testimony. (Id.). As such, Claim Two is unexhausted and procedurally defaulted.

If a procedural default has occurred, a federal court may not address the merits of a state prisoner's habeas claim unless the petitioner can show (1) both cause for the default and prejudice that would result from failing to consider the claim on the merits; or (2) that the failure to consider the claim on the merits would result in a miscarriage of justice, specifically, the conviction of one who is actually innocent. See Murray, 477 U.S. at 495–96; Breard, 134 F.3d at 620. "Cause" consists of "'some objective factor external to the defense [that] impeded counsel's efforts' to raise the claim in state court at the appropriate time." Id. (quoting Murray, 477 U.S. at 488). To demonstrate prejudice, the petitioner must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." United States v. Frady, 456 U.S. 152, 170 (1982); Murray, 477 U.S. at 494. Under the second exception, a petitioner may obtain review of procedurally defaulted claims if the case "falls within the 'narrow class of cases . . . implicating a fundamental miscarriage of justice.'" Schlup v. Delo, 513 U.S. 298, 314–15 (1995) (quoting McCleskey v. Zant, 499 U.S. 467, 494 (1991)). Such cases are generally limited to those for which the petitioner can show that "a constitutional violation has probably resulted in the conviction of one who is actually innocent." Murray, 477 U.S. at 496.

Kaur has not provided the Court with any arguments for why the procedural default of Claim Two should be excused, instead arguing that it is not defaulted because it is the "same" claim that was presented to the state courts. (Reply Supp. Pet. Writ. Habeas ["Reply"] at 44, ECF No. 27). Kaur may have presented the same facts to the Appellate Court, but, as mentioned above, her legal argument was based solely on Maryland law. Where Kaur has provided no basis for excusing the procedural default, Claim Two is not properly before this Court. However, as discussed below, even if Claim Two was not defaulted, it would be dismissed on the merits.

**B.     Merits Review**

**1.     Standard for Relief Under 28 U.S.C. § 2254**

In analyzing Kaur's petition for a writ of habeas corpus, the Court is bound by the standard of review for the Antiterrorism and Effective Death Penalty Act ("AEDPA"). The Court may grant the writ on a claim adjudicated on the merits in a state court proceeding only if the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or involved an "unreasonable application" of such law, or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1); 28 U.S.C. § 2254(d)(2); Harrington v. Richter, 562 U.S. 86, 98 (2011); Bell v. Cone, 535 U.S. 685, 693–94 (2002); Williams v. Taylor, 529 U.S. 362, 376 (2000).

In assessing a petitioner's habeas claims, the district court looks to the opinion of "the last reasoned decision of a state court addressing the claim." Allen v. Stephan, 42 F.4th 223, 247 (4th Cir. 2022), cert. denied sub nom. Chestnut v. Allen, 143 S.Ct. 2517 (2023)

(quoting <u>Woodfolk v. Maynard</u>, 857 F.3d 531, 544 (4th Cir. 2017)). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts." <u>Williams</u>, 529 U.S. at 412–413. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the [petitioner's] case." <u>Id.</u> at 413.

In other words, to obtain relief on her petition, Kaur must identify the "clearly established" legal principle on which she relies. To qualify as "clearly established," a principle must originate from an actual Supreme Court holding, not from its passing dicta. <u>See</u> <u>White v. Woodall</u>, 572 U.S. 415, 419 (2014). Kaur also must describe this holding with specificity. <u>See</u> <u>Brown v. Davenport</u>, 596 U.S. 118, 136 (2022). She cannot recite a holding at a "high level of generality." <u>Lopez v. Smith</u>, 574 U.S.  6 (2014) (per curiam) (citation omitted); <u>Metrish v. Lancaster</u>, 569 U.S. 351, 367–68 (2013). Circuit precedent cannot turn "a general principle of Supreme Court jurisprudence into a specific legal rule" that has not been stated by the Supreme Court. <u>Lopez</u>, 574 U.S. at 7 (quoting <u>Marshall v. Rodgers</u>, 569 U.S. 58, 64 (2013)).

If relying on the "unreasonable application" clause, Kaur next must show that the state court engaged in an "unreasonable application" of clearly established law. Under this test, a federal court's belief that a state court committed an error when applying a legal principle to the facts of a case does not suffice. Rather, the federal district court must be

able to describe the state court's application as "objectively unreasonable[.]" <u>White</u>, 572 U.S. at 419 (quoting <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75–76 (2003)). To warrant that description, a state court must have committed "an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." <u>Harrington</u>, 562 U.S. at 103.

Kaur faces an additional hurdle if she alleges a trial court error that the state court subjected to harmless error review. Under these circumstances, a federal court cannot grant habeas relief without applying both the test outlined in <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993), and the deferential review required by AEDPA. <u>Brown</u>, 596 U.S. 118. <u>Brecht</u> requires a state prisoner seeking to challenge his conviction in collateral federal proceedings to show that the error had a "substantial and injurious effect or influence" on the outcome of his trial. 507 U.S. at 637 (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)). A "substantial and injurious effect or influence" means "actual prejudice." <u>See</u> <u>id.</u> at 637–38. A "federal court must <u>deny</u> relief to a state habeas petitioner who fails to satisfy either [<u>Brecht</u>] or AEDPA. But to <u>grant</u> relief, a court must find that the petitioner has cleared both tests." Brown, 596 U.S. at 134. To succeed on any of her trial error claims, Kaur must convince this federal habeas court that there is grave doubt about her verdict <u>and</u> demonstrate that every fairminded jurist would agree that the error was prejudicial. <u>Id.</u> at 135.

As discussed in detail below, these standards foreclose Kaur's claims.

2.      **Claim One:  Violation of Attorney-Client Privilege**

In Claim One, Kaur argues that her Sixth Amendment right to counsel was violated because the prosecution team in her second trial had access to the contents of the privileged materials in her defense file from the first trial. (Pet. at 43–67). Citing <u>Weatherford v. Busey</u>, 429 U.S. 545 (1977), Kaur argues that United States Supreme Court precedent holds that the Sixth Amendment encompasses the attorney-client privilege. (<u>Id.</u> at 43). Kaur also argues that precedent establishes the right to a new trial when the government purposefully intrudes on the attorney-client privilege. (<u>Id.</u> at 45–46). Kaur takes the position that the state "purposefully" intruded on the privilege when it subpoenaed the file, cross-examined the defense team on its contents during the hearings on the motion for a new trial, and employed the same prosecution team during the second trial. (<u>Id.</u> at 51–55).  Kaur details the various ways she believes she was prejudiced during the second trial because the prosecution team had seen her original trial attorney's file. (<u>Id.</u> at 57–67).

Respondents argue that the Appellate Court's rejection of Claim One withstands AEDPA scrutiny because it is not contrary to any controlling Supreme Court authority. (Answer Resp. Habeas Pet. at 57–63). Respondents dispute Kaur's characterization of the state's receipt of the defense file as an "intrusion" of the attorney-client privilege, arguing that Kaur waived the privilege by raising claims of ineffective assistance of trial counsel. (<u>Id.</u> at 60).  Respondents further argue that Kaur has not demonstrated that the Appellate Court unreasonably applied the facts when it concluded that she was not prejudiced, noting that the arguments advanced by Kaur primarily rely on documents that were not part of the state court record and are improperly before this Court. (<u>Id.</u> at 62–72).

The Appellate Court dismissed Claim One in a reasoned decision issued on June 7, 2009. <u>Kaur</u>, 2019 WL 2407997. The Appellate Court began by acknowledging that there were no reported decisions in Maryland addressing whether a trial court commits error by refusing to disqualify prosecutors who had access to the defense file under the circumstances. <u>Id.</u> at *8. The Appellate Court rejected the state's argument that Kaur expressly waived attorney-client privilege by placing an unsealed affidavit in the record to support her ineffective assistance of counsel claim. <u>Id.</u> at *13. Instead, the Appellate Court found that the district court's ruling was consistent with a conclusion that Kaur had impliedly waived the privilege. <u>Id.</u>

The Appellate Court then concluded that Kaur was required to demonstrate prejudice to obtain relief, regardless of how the file was obtained. <u>Id.</u> at *16. This is because Maryland case law requires proof of prejudice to obtain relief for a violation of the attorney-client privilege, even when the intrusion was improper. <u>Id.</u> The Appellate Court then rejected each of Kaur's arguments that she was prejudiced. <u>Id.</u> at *18–*24.

First, Kaur argued that the prosecution became aware of defense strategies. <u>Id.</u> at *17. The Appellate Court found that the defense strategy to use Indian cultural norms to explain the dynamics of the relationship between Kaur and her husband was revealed by <u>defense counsel</u> during opening statements in the first trial. <u>Id.</u> at *18. The Appellate Court rejected Kaur's argument that she was prejudiced because she elected not to testify, finding "absent a proffer of what Ms. Kaur's direct testimony would have been, her bald assertion

that she was prejudiced is nothing more than an invitation for us to presume that she was prejudiced . . . ." Id. at *18–*19.[3]

The Appellate Court of Maryland next addressed Kaur's argument that the state changed its strategy after seeing the defense file regarding a wig seized from the vehicle from which she was arrested. Id. at *19–*21. The wig was found in packaging from a costume store, Performance Studios, but it was not the same wig that was originally sold in the packaging. Id. at *20. The Appellate Court acknowledged that there were materials in the defense file that discussed the purchase of a second wig and assumed the state learned about the second wig from the defense file. Id. During the second trial, the state called an employee from Performance Studios, who testified about the wig contained in the original packaging. Id. The Appellate Court found that Kaur was not prejudiced because none of the eyewitnesses to the shooting testified that the shooter was wearing a wig. Id. Also, cross-examination of the Performance Studios employee tended to support Kaur's theory that her husband was the shooter because the defense elicited testimony that the wig sold by Performance Studios was intended to be worn by a man, and the receipt included

---

[3] The record does contain Kaur's testimony from the hearing on her motion for a new trial, where she gave an account of what her testimony would have been had she testified at the first trial. (Mot. New Trial at 7–107, ECF No. 23-7). Kaur contends that she was discouraged from testifying at her second trial based, inter alia, on comments made by prosecutor, Marybeth Ayres, while arguing against her motion for a new trial "I made a list, Your Honor, of all the negatives, that befall the defendant from testifying…" (Aug. 14, 2015 Hr'g. at 36, ECF No. 23-9); and comments made by the same prosecutor at the outset of the second trial that she had an independent recollection of her cross-examination of Kaur from the motion for a new trial hearing, and could not forget it, but would rely on her professionalism not to use any privileged information. (Nov. 1, 2016 Trial Tr. at 10–11, ECF No. 25-13); (Pet. at 60).

purchases of makeup intended to darken the skin, and a prothesis intended to age one's face. Id. at *21.

The Appellate Court of Maryland also rejected Kaur's argument that the state gained an unfair insight into her strategy that her husband was the shooter, or that she intended to argue relationship issues with her husband, finding that the defense had used the same strategy in the first trial. Id. at *21–22. Lastly, the Appellate Court concluded that the state did not use any privileged information to change its strategy on presentation of the DNA evidence, finding that in both trials the state presented the same testimony and made the same argument that the murder weapon did not test positive for Kaur's DNA because her husband had wiped it off when they returned home. Id. at *23–24.

"The starting point for cases subject to § 2254(d)(1) is to identify the 'clearly established Federal law, as determined by the Supreme Court of the United States' that governs the habeas petitioner's claims." Marshall, 569 U.S. at 61 (quoting Williams v. Taylor, 529 U.S. 362, 412 (2000)). Kaur has named Weatherford as the Supreme Court case upon which habeas relief should be granted.

In Weatherford, an undercover law enforcement agent, Weatherford, was arrested and indicted along with a co-defendant, Bursey. 429 U.S. at 547. Bursey's attorney asked Weatherford to attend trial preparation sessions, not knowing that he was an undercover agent. Id. at 547–48. Weatherford testified for the prosecution at trial but did not testify about the trial preparation sessions. Bursey was convicted. Id. at 548–49.

Bursey sued Weatherford under 42 U.S.C. § 1983 in Weatherford's capacity as a state law enforcement agent. Id. at 549. Bursey alleged that Weatherford had

communicated defense strategies and plans to the prosecutors, thereby violating Bursey's right to effective assistance of counsel under the Sixth and Fourteenth Amendments. Id. The Supreme Court determined that Bursey had not made out a Sixth Amendment violation because Weatherford had "communicated nothing about the [attorney] meetings to anyone else." Id. at 556.

The Weatherford opinion does not overtly state that the Sixth Amendment encompasses the right to protected attorney-client communication, but it did make the following comment: "There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by Weatherford, there was no violation of the Sixth Amendment insofar as it is applicable to the States by virtue of the Fourteenth Amendment." Id. at 558.

Ostensibly, based on the foregoing statement, every Circuit that has applied Weatherford in the attorney-client privilege context has interpreted it as extending a Sixth Amendment right. See United States v. Mastroianni, 749 F.2d 900, 907–08 (1st Cir. 1984); United States v. Dien, 609 F.2d 1038, 1043 (2d Cir. 1979); United States v. Costanzo, 740 F.2d 251, 254 (3d Cir. 1984); United States v. Brugman, 655 F.2d 540, 546 (4th Cir. 1981); United States v. Chavez, 902 F.2d 259, 266–67 (4th Cir. 1990); United States v. Diaz, 941 F.3d 729, 739 (5th Cir. 2019); Sanborn v. Parker, 629 F.3d 554, 568–569 (6th Cir. 2010); United States v. Singer, 785 F.2d 228, 234 (8th Cir. 1986); United States v. Danielson, 325 F.3d 1054, 1059 (9th Cir. 2003), as amended (May 19, 2003); Shillinger v. Haworth, 70 F.3d 1132, 1142 (10th Cir. 1995); United States v. Roper, 874 F.2d 782, 790 (11th Cir. 1989).

The Circuit Courts have had various interpretations of what proof is required to establish a violation of the right. In the First and Ninth Circuits, once the defendant establishes a prima facie case of invasion of the privilege, the burden shifts to the government to prove that no prejudice ensued. Mastroianni, 749 F.2d  at 907–08; Danielson, 325 F.3d at 1071, as amended (May 19, 2003). The Sixth and Eleventh Circuits find a Sixth Amendment violation if there is an intentional violation by the government or resulting prejudice. Sanborn, 629 F.3d at 569; Roper, 874 F.2d at 790 (11th Cir. 1989). The Fifth and Seventh Circuits require a showing of prejudice. Diaz, 941 F.3d at 739; Guajardo-Palma v. Martinson, 622 F.3d 801, 805–06 (7th Cir. 2010). In the Tenth Circuit, if the defendant can show that the intrusion was "intentional," it is a per se violation of the Sixth Amendment. Shillinger, 70 F.3d at 1142.

The issue is even murkier within the Fourth Circuit. The Fourth Circuit recognized a Sixth Amendment right to privileged attorney-client communications in two federal direct appeal cases, Brugman, 655 F.2d at546,and Chavez, 902 F.2d at 266–67.Yet, in a capital habeas corpus case, the Fourth Circuit held:

> [T]he "attorney-client privilege is a creation of the common law, not the Constitution." Lange v. Young, 869 F.2d 1008, 1012 n.2 (7th Cir. 1989). Because federal habeas review is limited to "violations of the United States Constitution or its law and treaties," Cooper v. Taylor, 103 F.3d 366, 370 (4th Cir. 1996) (en banc), cert. denied, 522 U.S. 824  (1997), a mere violation of Smith's attorney-client privilege would not warrant habeas relief, see Lange, 869 F.2d at 1012 n.2 (noting that "[e]ven if a violation of the attorney-client privilege occurred, this violation alone would be insufficient grounds for [habeas] relief.").

Smith v. Moore, 137 F.3d 808, 819–20 (4th Cir. 1998). The petitioner in Smith argued that the state violated his attorney-client privilege by calling a defense-retained psychologist in rebuttal at trial. Id. at 20.[4]

Since nearly every Circuit Court has recognized a clearly established right based on Weatherford (including the Fourth Circuit), the Court will assume that the Sixth Amendment extends to a violation of the attorney-client privilege. But because the petitioner in Weatherford had no case, the Supreme Court provided no definitive test on the necessary proof for a successful Sixth Amendment claim. Hence, the various ways in which the Circuit Courts have implemented relief for violations of the privilege following the Weatherford decision.

Like most of the federal Circuit Courts, the Appellate Court of Maryland required Kaur to prove that her defense had been prejudiced by the invasion of her attorney-client privilege. Given the lack of clear direction from the Supreme Court and the various ways the issue has been handled by the federal Circuit Courts, this Court cannot say that the Appellate Court's decision is contrary to federal law.[5]

---

[4] Kaur cites United States v. Nicholson, 611 F.3d 191 (4th Cir. 2010), for the proposition that she is "entitled to a new trial by prosecutors untainted by the privileged information her lawyers were forced to divulge under the State's subpoenas." (Pet. at 51). Nicholson involved a federal criminal defendant's motion to vacate, where the Fourth Circuit granted a motion for a protective order, prohibiting the government from using privileged information on remand and ordering a new judge. While Nicholson may provide some insight on what the Fourth Circuit would likely to do in a 28 U.S.C. § 2255 case, it does not provide any direction on how this Court should defer to the Appellate Court's opinion in this 28 U.S.C. § 2254 case.

[5] The parties disagree about how the state's acquisition of the defense file should be characterized. Kaur argues that it was "purposeful." (Pet. at 52–56). The state argues that it was not "wrongful" because it was obtained during the post-trial proceedings and because

The Court also cannot say that the Appellate Court's application of the facts to the law was unreasonable. Kaur advances the same arguments in her habeas petition that she did on direct appeal as to why she was prejudiced by the prosecution's access to her defense file. (Pet. at 27–38). Kaur disagrees with the Appellate Court's interpretation of the facts, (id. at 51–68), but fails to show that no reasonable jurist could have reached the conclusion that she did not demonstrate prejudice. The failure to meet this standard is fatal to her claim.

The Court is sympathetic to Kaur's dilemma. The Supreme Court has indicated that she has a Sixth Amendment right to protected communications with her counsel. But the various ways the Circuit Courts have vindicated that right does not seem to be workable in a circumstance where, as here, the prosecution obtained the entire defense file in post-trial proceedings and then had access to that file during a second trial. As the Respondent has pointed out, the state obtained the defense file using lawful process. On the other hand, as noted by Justice Sotomayor, there are various insidious ways a prosecution team could gain an advantage under these circumstances that a petitioner would not be able to identify during a prejudice review.[6]

---

Kaur waived the privilege. (Pet. at 44). The Court need not resolve this issue because, as explained herein, the Appellate Court's decision, which required a showing of prejudice regardless of how the privileged information was acquired, is not contrary to federal law.

[6] Justice Sotomayor noted that it may be impossible to determine whether Kaur was prejudiced by simply comparing the first and second trial transcripts side-by-side. Kaur v. Maryland., 141 S.Ct. 5, 7 (2020) (Mem.). There are appreciable differences between the two trials, including new witnesses (David Hahn (Nov. 1, 2016 Transcript at 141–152, ECF No. 25-13), Cynthia Lewis (id. at 153–167), Robert Paith (Nov. 4, 2016 Transcript at 96–104, ECF No. 25-17), Elizabeth Koperwhats (id. at 104–114), and Charles Tubbs (id. at 114–137)), but it is unknown whether the differences are a result of the learning curve associated with trying the same case for a second time or because the prosecution utilized privileged information. The Appellate Court assumed that the prosecution called Charles

This Court, sitting in habeas corpus review, is not vested with the authority to resolve questions of federal law that are not clearly established. This Court's role is to decide whether the Appellate Court of Maryland, in denying Kaur's claims, acted contrary to federal law. Without a clear United States Supreme Court holding saying that she is entitled to relief under the circumstances, this Court simply cannot grant the relief that Kaur seeks.

However, the Court is reluctant to conclude that reasonable jurists would not find its assessment of the claim debatable or wrong. Arguably, the comment by the Supreme Court in <u>Weatherford</u>, quoted above, was not dicta but was meant to be the creation of a test for the proof necessary to make out a Sixth Amendment claim. It could also be argued that the test was meant be to be applied disjunctively and on an <u>ad hoc</u> basis. The Court concludes the issue deserves further review sufficient to warrant a certificate of appealability under 28 U.S.C. § 2253(c)(2). Accordingly, the Court certifies the following issue for appeal: was Kaur's Sixth Amendment right to counsel violated when her second trial was conducted by a prosecution team that had access to the defense file from her first trial, obtained through subpoenas issued by the state during post-trial proceedings?

---

Tubbs from Performance Studios after learning privileged information, but ultimately determined that Kaur was not prejudiced by his testimony. <u>Kaur</u>, 2019 WL 2407997, at *20–21.

### 3.      Claim Two: Exclusion of Expert Testimony

As discussed above, Claim Two is procedurally defaulted, but it also fails on the merits. Kaur argues that her due process rights were violated when the trial court excluded the testimony of her witness identification expert, Dr. Elena Kovera.

Before Kaur's second trial, the state filed a motion in limine to exclude the testimony of Dr. Kovera, who was slated to provide testimony on behalf of the defense on the pitfalls of eyewitness testimony. (State R. App. Vol. 2 at 143–147). The State argued that "the mere probing of the general pitfalls that may surround the area of eyewitness testimony, proposed by this witness, is not an appropriate subject for expert testimony." (Id. at 144). Kaur opposed the motion (id. at 152–158) on the grounds that "accurate information regarding the psychological nuances of perception, encoding, storage, and retrieval of witnessed events is not within the 'ken of an ordinary juror.'" (Id. at 154). The trial court did not rule on the state's motion until after the eyewitnesses testified at trial. (Id.).

On the first day of the second trial, a mother and son, Elena Komarova and Nicholas Jin-Komarov,[7] testified that they witnessed the shooting of Preeta Gabba. (Id.). Komarova testified that she was driving her son to football practice on the morning of October 12, 2013, when she saw two ladies on the left side of the road. (Nov. 1, 2016 Tr. at 251, ECF No. 25-13). She heard loud popping noises and then saw one of the ladies start crossing the road and fall in front of her car. (Id. at 251, 253). Komarova testified that the second lady

---

[7] The witnesses spelled their names for the court reporter at trial.

turned and ran away before the first lady fell. (Id. at 255). Komarova described the second lady as having "dark" skin tone, being overweight, and wearing an orange scarf and a loose brown coat. (Id. at 254, 266). Jin-Komarov testified that he heard three to four gunshots and saw a lady fall. (Id. at 268). He described the second lady as obese with a light brown skin tone. (Id. at 269, 270). Both witnesses admitted that they originally thought that the lady that left the scene was African American. (Id. at 265, 272).

After the witnesses testified, the trial court granted the state's motion in limine. (Nov. 4, 2016 Order at 6–8, ECF No. 25-17). The trial court found that neither of the witnesses identified Kaur as the shooter, nor did they testify that they were under stress when they saw the shooting. (Id.). The trial court also found that the issues of the effects of stress on accuracy of witness identification and difficulties of cross-racial identification are self-evident and not beyond the knowledge of the average juror. (Id.).

Kaur argued on direct appeal that the trial court's decision to exclude Dr. Kovera's testimony contravened Maryland evidentiary rules. Kaur, 2019 WL 2407997, at *27–30. The Appellate Court found that the trial court did not abuse its discretion in excluding the testimony because it would not have provided "appreciable help to the trier of fact." Id. The Appellate Court noted that the issues were within the knowledge of the average juror and no eyewitness had identified Kaur as the shooter. Id. at 30.

In her habeas petition, Kaur argues that she is entitled to relief because the trial court's decision to exclude Dr. Kovera's testimony interfered with her right to present a complete defense. (Pet. at 69–77). Specifically, she argues that the decision was arbitrary

because it "downplay[ed] the significance of the eyewitness testimony," and did not consider the scientific studies supporting Dr. Kovera's testimony. (Id. at 75).

A defendant has a well-established constitutional right to present a defense and call witnesses in support. Chambers v. Mississippi, 410 U.S. 284, 294 (1973). However, the right is limited. Holmes v. South Carolina, 547 U.S. 319, 326 (2006). The court may exclude evidence "if its probative value is outweighed by certain other factors such as unfair prejudice, confusion of the issues, or potential to mislead the jury." Id. Even if a rule itself is constitutional, its application in a specific circumstance may still violate the Constitution if it "infring[es] upon a weighty interest of the accused" and is "'arbitrary' or 'disproportionate to the purposes [it is] designed to serve.'" Id. at 324 (quoting United States v. Scheffer, 523 U.S. 303, 308 (1998)). If evidence is improperly excluded, a petitioner is only entitled to relief if its exclusion had a "substantial and injurious effect or influence in determining the jury's verdict." Brecht, 507 U.S. at 637 (quoting Kotteakos, 328 U.S. at 776).

Kaur argues that the exclusion of Dr. Kovera's testimony was "arbitrary," but a review of the record demonstrates that the trial court's decision was based on a considered analysis of the content of the eyewitness testimony and whether expert testimony would be helpful to the trier of fact. Moreover, the Appellate Court engaged in a thorough examination of Maryland precedent on the issue and found that the trial court had not abused its discretion. Because the trial court was not arbitrary in excluding Dr. Kovera's testimony, the decision is not contrary to federal law. Discretionary exclusion of eyewitness identification experts falls within the range of what reasonable jurists do. See

Richardson v. Kornegay, 3 F.4th 687, 698 (4th Cir. 2021) (citing United States v. Davis,

690 F.3d 226, 257 (4th Cir. 2012); United States v. Harris, 995 F.2d 532, 534 (4th Cir.

1993); United States v. Baylor, 537 F.App'x 149, 158 (4th Cir. 2013); United States v.

Bellamy, 26 F. App'x 250, 259 (4th Cir. 2002)).[8]

Even if Claim Two was not procedurally defaulted, it would be dismissed for lack

of merit.

## C.   Certificate of Appealability

A petitioner may not appeal the dismissal or denial of a federal habeas petition

without first receiving a certificate of appealability. 28 U.S.C. § 2253(c)(1). The Court may

issue a certificate of appealability "only if the applicant has made a substantial showing of

---

[8] Kaur would also be unable to meet the standard that the exclusion of the testimony had a "substantial and injurious effect" on the verdict. Brecht, 507 U.S. at 637 (quoting Kotteakos, 328 U.S. at 776). Neither of the two eyewitnesses identified Kaur as the shooter and other inculpatory evidence was introduced at trial. For example, the murder weapon was found in the vehicle Kaur was in when she was arrested (Nov. 2, 2016 Transcript at 228–230, ECF No. 25-14; Nov. 3, 2016 Transcript 2 at 8–11, 38–39, ECF No. 25-16); GPS data from the weekend before the shooting showed Kaur's vehicle in the vicinity and showed Kaur's vehicle in D.C. on the day of the shooting (Nov. 2, 2016 Transcript at 101, 144–155); Kaur stayed in a hotel located near the shooting (Nov. 1, 2016 Transcript at 222–242, ECF No. 25-13); and Kaur was present when the murder weapon was purchased (Id. at 163–221). The state introduced additional evidence of a conspiracy to murder Gabba with her husband, including testimony that his divorce with Gabba was "high conflict" (Id. at 93–100); Gabba had filed a protective order against Kaur's husband alleging that he had threatened to kill her (Id. at 115–116); Kaur assisted her husband in spying on Gabba and referred to her as "dragon" (Nov. 2, 2016 Transcript at 172–182; Nov. 3, 2016 Transcript at 15; Nov. 4, 2016 Transcript at 191, ECF No. 25-17); Kaur purchased an oversized "plum" colored jacket the night before the murder at Wal-Mart (Id. at 96–114); Kaur was with her husband when the murder weapon was purchased, was with her husband immediately after the murder occurred at a business conference, and was arrested with him shortly after the murder in a vehicle where the murder weapon was found (Nov. 1, 2016 Transcript at 163–221; Nov. 3, 2016 Transcript 1 at 96–150, ECF No. 25-15; Nov. 3, 2016 Transcript 2 at 8–11).

the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). Under the controlling standard, a petitioner must show that "reasonable jurists could debate whether . . . the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)). For a certificate of appealability to issue, a petitioner need not prove "that some jurists would grant the petition for habeas corpus." Id. at 338.

As discussed above, the issue presented in Claim One is "adequate to deserve encouragement to proceed further." Id. at 336. Therefore, the Court will issue a certificate of appealability, limited to the question: was Kaur's Sixth Amendment right to counsel violated when her second trial was conducted by a prosecution team that had access to the defense file from her first trial, obtained through subpoenas issued by the state during post-trial proceedings? A certificate is denied on all other claims.

## IV.    CONCLUSION

For the foregoing reasons, Kaur's Petition for Writ of Habeas Corpus, (ECF No. 1), will be dismissed. A certificate of appealability will be issued on Claim One. A separate Order follows.

Entered this 15th day of April, 2024.

_____/s/_____
George L. Russell, III
United States District Judge