IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| RAMINDER KAUR, | * | |
| Petitioner, | * | |
| v. | * | Civil Action No. GLR-21-1780 |
| ROBERT L. GREEN, et al., | * | |
| | * | |
| Respondents. | * | |

***

**<u>MEMORANDUM OPINION</u>**

THIS MATTER is before the Court on Petitioner Raminder Kaur's First Amended

Petition for Writ of Habeas Corpus (the "Amended Petition") (ECF No. 62). The matter is

ripe for review, and no hearing is necessary. <u>See</u> R. Govern. § 2254 Cases U.S. Dist. Ct.

8(a); 28 U.S.C. § 2254(e)(2); Local Rule 105.6 (D.Md. 2025); <u>see also</u> <u>Fisher v. Lee</u>, 215

F.3d 438, 455 (4th Cir. 2000) (noting that petitioners are not entitled to a hearing under 28

U.S.C. § 2254(e)(2)). For the reasons outlined below, the Court will grant Kaur's Amended

Petition.

## I.   BACKGROUND

### A.   <u>State Court Proceedings</u>

#### 1.   First Trial

On November 22, 2013, Kaur was indicted in the Circuit Court for Montgomery

County on charges related to the murder of Preeta Gabba. (State Ct. Rec. Vol. I at 13, ECF

No. 25).[1] Kaur was tried jointly with her husband, Baldeo Taneja, from July 29, 2014 to August 7, 2014. (See ECF Nos. 25-3–25-10). Marybeth Ayres and Jessica Hall of the Montgomery County State's Attorney's Office represented the State, and Alan Drew of the Montgomery County Public Defender's Office represented Kaur. (July 29, 2014 Tr. 6:5–13, ECF No. 25-3).

The Appellate Court of Maryland (the "Appellate Court") described the factual background of Kaur's case in Kaur v. State, No. 2516, Sep. Term, 2016, 2019 WL 2407997, at *2–4 (Md.Ct.Spec.App. 2019), and this Court restated that background in its April 15, 2024 Memorandum Opinion, (see Apr. 15, 2024 Mem. Op. at 2–6, ECF No. 47). To summarize, the State's theory at the first trial was that Kaur shot and killed Gabba in conspiracy with Taneja, taking the position that Taneja's contentious divorce from Gabba, alimony payments, and the contempt proceedings related to those payments formed the motive for the murder. (July 29, 2014 Tr. 18:21–22:24).

As is relevant to Kaur's Amended Petition, the State mentioned only one wig and one jacket at the first trial, and neither was a central theme of the case. The State referred to a black wig in its opening statement, (id. 18:6–7), and two witnesses testified that investigators recovered a black wig from inside a blue backpack when searching Kaur and Taneja's car after their arrests, (Aug. 4, 2014 Tr. 141:7–8, 159:17–60:2, 195:9–15, ECF No. 25-7; Aug. 1, 2014 Tr. 206:17–18, 214:4–10, ECF No. 25-6). During its closing argument, the State theorized that the wig was part of the supplies for Kaur and Taneja's

---

[1] Citations to page numbers refer to the pagination assigned by the Court's Case Management/Electronic Case Files ("CM/ECF") system.

escape. (Aug. 6, 2014 Tr. 79:1–10, ECF No. 25-9). The State also mentioned that Kaur and Taneja purchased a single jacket, as shown on a Walmart receipt. (Id. 91:4–10). Taneja's counsel argued in closing that Taneja could not have been the shooter because one of the State's eyewitnesses had testified that the shooter had dark skin and appeared to have dreads, but the wig found in the car was not styled with dreads. (July 31, 2014 Tr. 92:14–93:12, 105:5–13, ECF No. 25-5; Aug. 6, 2014 Tr. 120:18–22:23). In rebuttal, the State argued that if Kaur had worn a wig with dreads, then she disposed of it before she was caught. (Aug. 6, 2014 Tr. 199:5–10).

On August 7, 2014, the jury found both Kaur and Taneja guilty of first-degree murder, conspiracy to commit murder, and use of a handgun in the commission of a crime of violence. (Aug. 7, 2014 Tr. 29:6–25, ECF No. 25-10).

### 2.      Motion for a New Trial

On August 18, 2014, Kaur filed a Motion for a New Trial. (State Ct. Rec. Vol. IV at 3–8, ECF No. 23-1; State Ct. Rec. Vol. I at 111–29). Kaur argued, inter alia, that she was denied effective assistance of counsel because she wanted to testify in her own defense, but defense counsel Drew convinced her that she could not. (State Ct. Rec. Vol. IV at 3–4). Attached to the Motion was a handwritten affidavit signed by Drew and Kaur that set out the basis for the Motion. (Id. at 11–21).

The State opposed the Motion and issued a slate of subpoenas for the Maryland Office of the Public Defender's ("OPD") defense files. (State Ct. Rec. Vol. I at 130–32, 139–52). OPD filed a Motion for a Protective Order, arguing that Kaur did not waive her attorney-client privilege by filing the Motion for a New Trial, that the subpoenas were

overbroad, and that they sought materials protected by attorney-client privilege. (Id. at 163–71). The State countered that Kaur's allegation of a "total breakdown of representation" entitled the State to the requested materials. (Id. at 172–77). The trial court ultimately denied OPD's Motion for a Protective Order, concluding that Kaur's ineffective assistance of counsel allegations were broad enough to entitle the State to the entire defense file. (Id. at 183–84; Feb. 25, 2015 Tr. 13:7–25, ECF No. 25-11).[2]

The trial court held a multi-day hearing on Kaur's Motion for a New Trial in July and August of 2015 (the "Hearing"). (See ECF Nos. 23-2–23-9). Drew and other members of Kaur's defense team testified at the Hearing. (July 13, 2015 Tr. 7:16, 152:3, ECF No. 23-2; July 14, 2015 Tr. 17:6, 86:5, ECF No. 23-3; July 14, 2015 Tr. (II) 5:2, ECF No. 23-4; July 15, 2015 Tr. 5:10, 150:10, ECF No. 23-5). Armed with the subpoenaed materials, the State questioned Kaur's defense team vigorously about the investigation, internal discussions on defense strategies and motion practice, consultations with experts, details about Kaur's version of events, and notes that Kaur passed during the first trial. (See ECF Nos. 43-1–43-3; July 13, 2015 Tr. 83:1–149:8; July 14, 2015 Tr. 42:9–82:18, 92:19–105:6; July 15, 2015 Tr. 88:20–148:12, 206:18–24:8; July 17, 2015 Tr. 5:9–101:11, ECF No. 23-6). Kaur also testified about the testimony she would have given at the first trial, (Aug. 3, 2015 Tr. 7:9–125:18, ECF No. 23-7), and the State cross-examined her extensively about

---

[2] The Order denying the Motion for Protective Order included the following caveat: "except that [OPD] may withhold from production such documents in the files sought that are not relevant to any claim of negligent trial preparation and privileged (for example, but not necessarily by way of limitation, communications about prior crimes, if any)." (State Ct. Rec. Vol. I at 183, ECF No. 25).

her communications with counsel and information that the State learned from the subpoenaed materials, (id. 125:20–60:18; Aug. 4, 2015 Tr. 52:4–93:25, ECF No. 23-8). In closing, the State emphasized the in-depth analysis that the prosecution team performed on Kaur's testimony and privileged documents and the impact on Kaur's decision not to testify at trial, stating that the prosecution team "scour[ed] through [the defense] file for a year" and that "[Ayres] made a list . . . of all the negatives that befall [Kaur] from testifying." (Aug. 14, 2015 Tr. 36:20–21, 54:14–15, ECF No. 23-9).

Among the topics discussed during the Hearing was the fact that Kaur and Taneja purchased two wigs—one from a CVS in Maryland and one from a Performance Studios in Tennessee. (Aug. 4, 2015 Tr. 72:12–21; July 17, 2015 Tr. 62:6–63:6; Hr'g Exs. Pt. 2 at 287, ECF No. 43-2). The State acknowledged that the evidence related to the two wigs would have been "fabulous" during the first trial, (Aug. 14, 2015 Tr. 44:16–23), and the State in fact used that evidence during Kaur's second trial, (see Subsection I.A.3 below).

Also relevant to Kaur's Amended Petition—particularly to Respondents Robert L. Green and Carol Harmon's (together, "Respondents") waiver argument, (see Answer Am. Pet. Writ Habeas Corpus ["Answer"] at 34–37, ECF No. 70)—Steven Mercer, Chief of Forensics at OPD, testified about how the affidavit attached to Kaur's Motion came to fruition. Defense expert Dr. McGraw visited Kaur the day after the guilty verdict and later reported some troubling information to Mercer. (July 17, 2015 Tr. 82:8–83:2). Public Defender Paul DeWolfe subsequently authorized Mercer to investigate Drew's representation of Kaur. (Id. 83:3–86:9; July 13, 2015 Tr. 153:3). Mercer met with Kaur at the Montgomery County Correctional Facility on Sunday, August 17, 2014, and returned

with Drew the next day. (July 14, 2015 Tr. (II) 45:2–46:23). During the meeting with Drew and Kaur, Mercer documented certain points on a legal pad to create the affidavit. (Id. 47:6–48:25, 51:7–61:12). Drew read every page and signed it. (Id. 61:19–63:7). Kaur asked to take the affidavit back to her cell to read it, but Mercer said she could not because the Motion for a New Trial was due that day, and it was nearly 2:00 p.m. (Id. 63:14–64:5). Mercer then read the affidavit aloud, and Kaur signed it. (Id. 64:5–66:7).

On November 6, 2015, the trial court ruled from the bench on Kaur's Motion for a New Trial. (Nov. 6, 2015 Tr. 3:22, ECF No. 23-10). The trial court held that Kaur was entitled to a new trial because she communicated a desire to testify, and Drew told her that she could not. (Id. 4:16–5:11). The trial court found that Kaur's proffered testimony would have been antagonistic to Taneja, requiring the counts to be severed, and leading to a continuance that would have benefited the defense. (Id. 7:4–8:12). The trial court also found, among other things, that Drew had an overwhelming case load and failed to prepare Kaur's defense adequately. (Id. 9:6–12:13).

After the court granted Kaur's Motion for a New Trial, Kaur filed a Motion for a Protective Order to prohibit the State from using any privileged information at the second trial. (State Ct. Rec. Vol. II at 13–35, ECF No. 25-1). Kaur requested that the trial court disqualify Ayres and Hall as prosecutors at her retrial because they "had . . . a front row seat for[] the deliberations and strategies of Ms. Kaur's defense team." (Id. at 13). The State countered that it did not intend to use the affidavit or the subpoenaed materials at the retrial, except for impeachment purposes. (Id. at 36–37, 46–47). Even so, the State argued that because Kaur waived her attorney-client privilege, the State could use testimony from

the Hearing in its case-in-chief and for impeachment if Kaur elected to testify in her defense. (Id. at 38–46). The State also argued that Kaur waived any request to disqualify Ayres and Hall from litigating her retrial by asserting an ineffective assistance of counsel claim, failing to bring that claim in a petition for postconviction relief, and failing to request a new prosecution team to handle the Hearing. (Id. at 47–54). Finally, the State argued that Kaur could not show that she was prejudiced because the State "[m]erely . . . read the materials, but [did] not us[e] any of them in any way at trial . . . ." (Id. at 52–53).

In reply, Kaur argued that the implied waiver of attorney-client privilege applied only to the Motion for a New Trial proceedings and did not extend to her retrial and that use of her Hearing testimony at her retrial would violate her constitutional rights. (Id. at 63, 65). Kaur also maintained that Ayres and Hall should be disqualified from her retrial, contending that "the privileged contents of [her] files are indelibly imprinted on the current prosecution team, and their knowledge of those disclosures has or will influence their preparation strategy, choice of witnesses, witness examinations, and every other tactical decision the State will make." (Id. at 71). Considering this "indelible imprint," Kaur argued that the State "carrie[d] the burden to show that there is no derivative use of privileged information." (Id. at 72).

On April 14, 2016, the trial court ruled from the bench on Kaur's Motion for a Protective Order. (Apr. 14, 2016 Tr. 4:2, ECF No. 23-11). The trial court believed Kaur expressly waived attorney-client privilege by publicly filing the affidavit with her Motion for a New Trial. (Id. at 4:12–24). That said, the trial court treated the waiver as a limited one and granted partial relief:

7

She has waived the privilege, however, quite frankly, fearing and so as to avoid another round of post-conviction proceedings, the Court will elect in this case—because the defendant may later claim according to some future time claim that she didn't authorize the publication of that information and the privilege is hers to waive, not her attorneys'—so to eliminate any potential problem in the future, notwithstanding that I think it's an express waiver case as defined by Bittaker, the Court will craft a remedy as though it were an implied waiver in this case under Bittaker, as though there had not been an express waiver, notwithstanding the fact that I believe there has been.

. . . .

So the Court finds from the evidence presented that there is little to no evidence that the defendant is suffering or has suffered from the disclosure of a two-and-a-half-year-old strategy that was crafted for a very different procedural circumstance out of a joint trial.

However, the defendant was required to disclose and did disclose, in order to pursue her claim of ineffective assistance of counsel and her due process right to a fair trial, certain attorney/client communications. To allow the State to use those communications would benefit the State. And under the holding of Carter v. State, 149 Md. App. 509, when you are dealing with the Sixth Amendment, unlike the Fourth and Fifth Amendment, in order to assure the defendant a fair trial, that it is necessary the Government not be permitted any beneficial use of information obtained as a result of the Sixth Amendment violation.

So with respect to that, in order to protect the defendant, the Court will prohibit the State from making any use of any attorney/client communication between the defendant and her attorney, as well as making any use of the affidavit that was filed in this case. This would include any testimony relating to any attorney/client communication that the defendant or her attorney produced at a hearing . . . on this matter. Frankly, I'm going to reserve on whether or not the State can have the right to make use, but it would only be for impeachment purposes, if at all, of the testimony of any other witness or the testimony

8

that the defendant may have given unrelated to any attorney/client communication at any subsequent trial of this matter. But if that use was permitted, it would be available for impeachment purposes only.

The Court expressly declines to strike the appearance of present counsel in this case. I find that it is unnecessary to protect the defendant against any prejudice suffered by result of her pursuing her ineffective assistance claim. Any advantage that the prosecutor might have had has been substantially, if not entirely, eliminated by the Court's order on this motion. As well, the Court finds that there is a competing interest that the Court has to take into consideration, and that is the State's ability in this case to use the senior prosecuting attorneys who have been prosecuting this case and working for the past two and a half years, and to permit those to prosecute the case at retrial.

. . . .

. . . [I]f I were to require the State to find somebody who had not been exposed to the information, they would almost certainly have to go out of county or find somebody who was a junior or inexperienced—they weren't around when this case was tried two and a half years ago. And I think that is an unreasonable and unnecessary remedy in this case and that the remedy instead that I have tailored, I think, addresses any prejudice that the defendant has suffered.

(Id. at 4:24–11:22 (emphases added)).

Conflict concerning implementation of the trial court's ruling developed quickly, and Kaur filed a Motion to Limit Use of Defendant's Prior Hearing Testimony on October 4, 2016. (State Ct. Rec. Vol. III at 9–13, ECF No. 25-2). Kaur expressed concern that the State would use her Hearing testimony to prepare for trial, arguing that "the State clearly prepared Ms. Kaur's cross-examination [at the Hearing] by reviewing privileged material[,] . . . that the vast majority of the questions posed to and answered by Ms. Kaur

were based on a review of her privileged material," and that "any review or use of Ms. Kaur's cross-examination [for the retrial] would necessarily entail a further invasion of her attorney-client privilege." (Id. at 10–11). Reserving her argument that the State was not entitled to cross-examine Kaur with her Hearing testimony, Kaur prepared and submitted a redacted version of the Hearing transcript that concealed the privileged portions. (Id. at 11, 13–139). Kaur suggested that the State be permitted to use only the redacted transcript to prepare for her potential cross-examination at retrial. (Id. at 11).

Like its response to Kaur's Motion for a Protective Order, the State argued that it was "committed to not using [Kaur's] testimony regarding the attorney-client communications" but that it could use "any statements made by [Kaur] unrelated to attorney-client communications." (Id. at 148). Kaur replied that the State misunderstood the issue and reiterated her concern that any further use of the Hearing testimony, including in the State's preparation for the retrial, would violate her attorney-client privilege. (Id. at 159–61).

The trial court reserved ruling on Kaur's Motion to Limit Use of Defendant's Prior Hearing Testimony until the first day of Kaur's retrial, November 1, 2016. (Nov. 1, 2016 Tr. 5:20–17:18, ECF No. 25-13). There, Kaur's counsel argued that the prosecutors' use of the Hearing transcript to prepare for trial would violate the trial court's ruling on Kaur's Motion for Protective Order. (Id. at 6:18–22). Ayres represented to the trial court that the State would not review the portions of the transcript that were related to attorney-client communications, (id. at 8:2–8), but Kaur's counsel expressed concern about how Ayres

would "draw the line," (id. 8:18–22). Ayres acknowledged the problem and reiterated that

the State would not use privileged information at the retrial:

> I have all the information in my head, but it's not going to be used at the trial in any form or fashion. I can do the same thing in deciding what can be used in, in cross-examining the witness based on privileged information. I can put that aside and not use it in the trial. I think that's the key thing is that I'm not going to be using it.
>
> I can't, none of us can ever take out what's in our head. And . . . I was at the motion for a new trial, so I'm exposed to it just the same way I would be if I'm reviewing it to prepare for cross and I put it aside. I think we have to have trust in our abilities as attorneys to say, okay, I see that, I can't use it, I'm not going to use it, I'm not going to think about it, it's not going to be a part of my cross. I don't need to, and I think, quite frankly, it's unfair for counsel to say this is, you know, what you can't use and this is what you can without me saying, oh no, this actually had nothing to do with the attorney-client privilege.

(Id. at 11:1–18).

The trial court found that Kaur "generated this issue by filing the motion for new

trial . . . [and] made [her] bed so to speak." (Id. at 13:14–21). But, out of concern that the

appellate courts would disagree, the trial court ruled:

> [A]s you prepare your cross-examination and your recollection is there's a section of the transcript that deals with this non-privilege, delegate to and it's some, one of your aides or an assistant or somebody that's helping you with the case, not, maybe Ms. Hall, but not necessarily Ms. Hall, she's doing other things, to find in the transcript that portion that relates to the issue that you want to inquire into and limit it in that fashion.
>
> So you, yourself, wouldn't be reviewing the transcript in its entirety, but you would identify sections for an assistant who then would go and tell you the section relating to this particular

issue is found at these pages and then say you could go to those pages, refresh your recollection as to precisely what was said and also then have it tee'd up in the event that she deviated from what was said at the prior hearing, you could go directly to that, but that way not exposing yourself to reviewing or re-reading the entirety of the transcript. So, is that acceptable?

(Id. at 13:25–14:17).

### 3.   Second Trial

Following the Court's ruling, the State opened Kaur's retrial with a new theme: "two guns, two wigs, and two jackets." (Id. 69:13). Ayres repeated an iteration of this phrase at least three times during her opening statement. (Id. 67:1–9, 69:13, 73:25–74:3). She made a point to tell the jury that Kaur and Taneja purchased a wig from Performance Studios and that the Performance Studios packaging was found in the car without the wig when they were apprehended. (Id. at 57:12–25). Ayres also highlighted that investigators found a wig in the car but that it was purchased from CVS. (Id. at 66:24–67:1).

During the retrial, the State introduced new evidence about the wigs and jackets both through new witnesses and through witnesses who testified at the first trial. Specifically, William Heverly testified at the retrial about a stop that Taneja and Kaur made on September 28, 2013, plotted on a map noted as State's Exhibit 64. (Nov. 2, 2016 Tr. 61:23, 91:15–92:3, ECF No. 25-14). Mike Roland, a detective with the Nashville Police Department, explained that the September 28, 2013 stop plotted on State's Exhibit 64 was Performance Studios, a Halloween shop that sells wigs. (Nov. 3, 2016 239:1–41:10, ECF No. 25-15). Roland did not testify at the first trial, and while Heverly testified at the first trial about the data pulled from the GPS in Taneja and Kaur's vehicle, he did not testify

about a stop on September 28, 2013 at Performance Studios. (See Aug. 1, 2014 Tr. 50:22, 72:24–87:9).

Dimitry Ruvin testified at the retrial that investigators found the wig in the vehicle inside a Performance Studios package that was inside a CVS bag. (Nov. 3, 2016 (II) 4:7, 24:20–25:13, ECF No. 25-16). When Ruvin testified at the first trial, he referenced neither Performance Studios nor CVS and said only that the wig was in a "plastic bag or container." (Aug. 4, 2014 Tr. 128:7, 195:5–15).

Performance Studios' employee Charles Edwards Tubbs testified for the first time at the retrial. (Nov. 4, 2016 Tr. 114:9–23, ECF No. 25-17). Tubbs identified a sticker on the bag found in the back of Taneja and Kaur's vehicle as one belonging to a black or brown, shoulder length Performance Studios wig. (Id. 115:8–25, 116:5–17). And he confirmed that the wig police found in Taneja and Kaur's vehicle was not a wig that Performance Studios sold. (Id. 115:8–21).

Elizabeth Koperwhats, an employee of Walmart's Danskin supplier, testified for the first time at the retrial as well. (Id. 105:1–19). Koperwhats testified about the Walmart receipt that the State only referenced in closing during the first trial, stating that one of the jackets shown on the receipt was a "plush plum" Danskin jacket. (Id. 106:13–07:22; Aug. 6, 2014 Tr. 91:4–10). Koperwhats also testified that the first time the Montgomery County Police Department contacted her was in June 2016, two months after the trial court granted Kaur's Motion for a New Trial. (Nov. 4, 2016 Tr. 113:8–20).

At the close of the State's case, Kaur advised the trial court that she would not testify in her own defense and maintained her position that the prosecution team should have been

13

recused from the retrial. (Nov. 9, 2016 Tr. 29:1–31:9, ECF No. 25-19). In its closing argument, the State repeated its theme, "two guns, two wigs, two jackets," and emphasized the evidence found in pairs. (Id. 55:1–8, 92:23–93:9). Ultimately, the jury, again, found Kaur guilty of first-degree murder, conspiracy to commit murder, and use of a handgun in the commission of a crime of violence, and the trial court sentenced Kaur to life imprisonment. (Jan. 23, 2017 Tr. 21:16–24, ECF No. 25-20).

### 4.    State Court Appeal

On January 30, 2017, Kaur appealed her conviction to the Appellate Court, asserting two assignments of error: (1) that the trial court erred in allowing a prosecution team with extensive knowledge of privileged information to litigate the retrial; and (2) that the trial court abused its discretion in excluding the testimony of her expert in eyewitness identification. (State Ct. Rec. Vol. I at 94; Appellant Br. at 8–9, ECF No. 3-9). In an opinion issued on June 7, 2019, the Appellate Court rejected the State's argument that Kaur had waived her arguments by failing to object at the retrial:

> We can dispose of the [State's contention that Kaur failed to preserve the issues for appellate review] quickly. Just prior to the second trial, a hearing was held on a motion, filed by Ms. Kaur, to limit the use of her prior testimony from the post-conviction hearing. In ruling on that motion, the court reiterated its prior ruling that Ms. Kaur:
>
>> generated this issue by filing the motion for new trial and, therefore . . . waived the privilege when she pursued as part of the motion for a new trial that her first attorney was . . . ineffective[.] [We have] sort of been down that road already, [and she] made [her] bed so to speak.
>
>> As the issue was raised to, and decided by, the trial court, there was no reason for defense counsel to object later in the trial.

14

> "The purpose of Maryland's preservation rule, Maryland Rule 8-131(a), is '(a) to require counsel to bring the position of their client to the attention of the lower court at the trial so that the trial court can pass upon, and possibly correct any errors in the proceedings, and (b) to prevent the trial of cases in a piecemeal fashion.'"

Kaur, 2019 WL 2407997, at *9 n.7 (emphasis added) (quoting Blanks v. State, 406 Md. 526, 538 (2008)). The Appellate Court also rejected the State's argument that Kaur expressly waived the attorney-client privilege by submitting an unsealed affidavit to support her ineffective assistance of counsel claims. Id. at *13. Instead, the Appellate Court found that the trial court's ruling was consistent with the conclusion that Kaur had impliedly waived the privilege. Id. The Appellate Court concluded, however, that Kaur was required to demonstrate prejudice to obtain relief, regardless of how the defense file was obtained, and rejected each of Kaur's arguments that she was prejudiced. See id. at *16–22.

Kaur filed a petition for a writ of certiorari with the United States Supreme Court, and the State filed a conditional cross-petition. (State Ct. Rec. Vol. III at 188–224). The Supreme Court denied Kaur's petition on October 5, 2020. Kaur v. Maryland, 141 S.Ct. 5 (2020). In an accompanying statement, Justice Sotomayor opined that "the criminal justice system failed to live up to its highest ideals," and expressed three specific concerns:

> First, it is deeply disconcerting that the State has suggested that defendants who raise ineffective-assistance-of-counsel claims during the trial phase must forfeit their right to privileged communications with counsel . . . .

> Second, this case demonstrates the many insidious ways that potential Sixth Amendment violations can affect the course of a trial . . . . Kaur's concern that the State might use her

15

privileged information for its own advantage was hardly hypothetical: One of the prosecutors had, in fact, already informed the court that she had taken the opportunity to "scour" Kaur's defense file and that she had "made a list of all the negatives that [would] befall the defendant" should she choose to testify. . . .

. . . It would be an impossible task for any court, no matter how diligent, to identify and assess all potential sources of prejudice simply by comparing the records of two trials.

Finally and crucially, the decision whether to allow the original prosecution team to retry Kaur was not the court's alone to make. The prosecutors, too, had a choice. And in making that choice, as with all prosecutorial decisions, those lawyers acted as "the representative[s] not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done."

Id. at *5–7 (Sotomayor, J.) (quoting Berger v. United States, 295 U.S. 78, 88 (1935)).

## B.      Federal Court Proceedings

On July 19, 2021, Kaur filed a Petition for Writ of Habeas Corpus in this Court, asserting two claims for relief: (1) that her right to counsel under the Sixth and Fourteenth Amendments was violated when her second trial was conducted by prosecutors with full knowledge of her attorney-client privileged communications and attorney work product; and (2) that her rights to due process and to present a complete defense under the Sixth and Fourteenth Amendments were violated when the trial court prevented her from offering expert testimony. (Pet. Writ Habeas Corpus ["Pet."] at 43, 67, ECF No. 1). On April 15, 2024, the Court issued a Memorandum Opinion and Order denying both claims. (Apr. 15, 2024 Mem. Op. at, 17–29; Apr. 15, 2024 Order, ECF No. 48). The Court found that Kaur was not entitled to habeas relief on Ground One because the contours of the violation of

16

one's Sixth Amendment right to effective assistance of counsel through use of attorney-client privileged communications is not clearly established in federal law and because the Appellate Court's conclusion that Kaur failed to demonstrate prejudice was not objectively unreasonable. (Apr. 15, 2024 Mem. Op. at 17–25). The Court also found that Ground Two was procedurally defaulted and lacked merit. (Id. at 12–14, 26–29).

The Court granted Kaur a Certificate of Appealability on Ground One. (Id. at 25, 30). Kaur subsequently appealed to the United States Court of Appeals for the Fourth Circuit. (ECF No. 49). On August 19, 2025, the Fourth Circuit issued an opinion vacating this Court's decision on Ground One and remanding the matter with instructions for de novo review. Kaur v. Warden, Md. Corr. Inst. for Women, 151 F.4th 595, 613 (4th Cir. 2025). The Fourth Circuit found that the Appellate Court made objectively unreasonable determinations of the facts in light of the evidence presented in the state court proceedings:

> The Appellate Court's finding that the newly discovered second wig was not prejudicial—and in fact was beneficial to Kaur—proves objectively unreasonable in light of the record before the Appellate Court. As discussed above, the Appellate Court found that the State was unaware of the existence of a second wig during Kaur's first trial and only learned of its existence through attorney-client privileged materials produced in the proceedings on the motion for a new trial. The Appellate Court made this finding because there was no evidence that "the State had an independent source for the information about a possible second wig."
>
> . . . .
>
> The Appellate Court also mistakenly found relevant that none of the eyewitnesses saw the shooter wearing the "black and grey streaked wig." The black and grey streaked wig was the only wig the State was aware of and raised during the first trial. It was the wig found in the back of Taneja and Kaur's vehicle

17

at the time of their arrest. That black and grey streaked wig, however, is not the wig that the Appellate Court should have considered as relevant to the eyewitness testimony. The relevant wig was the solid black wig purchased at Performance Studios. That was the second wig revealed through Kaur's attorney-client privileged materials. This distinction is critical. It is true, as the Appellate Court noted, that "none of the eyewitnesses to the shooting testified that the shooter was wearing a black and grey streaked wig." Instead, the eyewitnesses all testified that the shooter had dark hair. That is why the second wig overwhelmingly supported the State's theory at the second trial. The second, solid black wig, which went missing after the murder, was consistent with the eyewitness accounts of a shooter with entirely dark hair. The Appellate Court thus ignored clear and convincing evidence that the second wig actually supported the State's case.

It is also undeniable that the existence of the second, solid black wig supported the State's theory at the second trial. The State repeatedly mentioned the second wig in its opening statement, relying upon it to argue that Taneja and Kaur jointly planned the murder. In the words of the prosecutor: "[W]e have two guns and two wigs. One wig is missing, and one wig is not opened." "So we have two guns, one used, one not. Two wigs, one used, one not. And two jackets, one used, one not." "And you're also going to hear that . . . the police pulled [the car] over and found evidence of two guns, two wigs, two jackets." "The police found two guns. There's evidence of two wigs and two jackets, and two tickets to [the convention] cover story." The State also introduced a new witness, a Performance Studios employee who testified that the Performance Studios packaging found in Taneja's and Kaur's vehicle corresponded to the wig with solid black hair.

During closing arguments, the State returned to its theme that the key evidence came in twos:

> And the wigs, <u>why are there two wigs in the car, ladies and gentlemen? Why are there two wigs?</u> One is missing, one is missing, and even the picture, the cardboard picture of what it should have been like is gone, so no one could see the type of wig that they once had, and then there's one there, <u>because, ladies and</u>

> gentlemen, they were in this together. They were in this together. There was two guns, two wigs, two jackets. One wig missing, one jacket missing, because those were used.

The State repeatedly relied on the existence of the second wig, which the prosecution referenced 13 times during closing argument.

The Appellate Court's suggestion the second wig provided "significant support" to Kaur's theory that Taneja was the shooter was objectively unreasonable based on the evidentiary record. The Appellate Court's conclusion relied on several statements made by the Performance Studios employee during cross-examination. It was plain from the record, however, that the employee's answers did not help Kaur. Defense counsel attempted to elicit responses to support a theory that the black-haired wig was designed for a man and that the time stamp on the receipt did not match the time that evidence showed Taneja and Kaur visited Performance Studios. Both lines of questioning were unavailing. The employee explained that all the of the wigs sold at the store are unisex and that the time stamp on store receipts did not necessarily reflect the actual time of the purchase because the store's cash register was not always synced to the correct time.

Ultimately, clear and convincing evidence shows that the second, black-haired wig, which the State learned of through attorney-client privileged materials, supported the State's theory that Kaur acted as Taneja's accomplice. The wig served as powerful evidence in support of the State's case and cut directly against Kaur's defense that she was not involved in the murder and Taneja had acted alone. The second wig thereby helped the State address Kaur's admittedly weak motive by connecting her to Taneja. The evidence of the second wig was, therefore, prejudicial. It was objectively unreasonable for the Appellate Court to conclude otherwise based on the evidentiary record before it.

. . . .

Crucially, the trial court reserved judgment on whether the State could use the testimony it obtained from Kaur's motion for a new trial hearing to cross-examine her at the second trial.

19

The trial court reserved ruling until <u>after</u> Kaur provided direct testimony at the second trial, at which point Kaur would have no choice but to submit cross-examination by the State regardless of how the trial court ruled. Kaur made clear that she opted against testifying in her own defense because she could not be assured that the State would not be precluded from using attorney-client privileged information to cross-examine her.

. . . .

Kaur's affidavit and testimony demonstrate more than a "bald assertion" of prejudice. Kaur developed a clear record of what she wished to testify to and why it was prejudicial to effectively preclude her from testifying. Kaur explained that she wanted to testify about: the emotional and physical abuse in her relationship with Taneja; oversleeping on the day of the murder because of drugs that Taneja had given her and waking up disoriented and feeling ill; and Taneja's strange behavior that day including his abrupt decision to return to Nashville. She also wanted to testify that she had no knowledge that there had been guns in their car, or that Taneja had planned to kill Gabba. Finally, Kaur wanted to describe Taneja's admissions that he had disguised himself as a woman and committed the murder while Kaur was sleeping at the hotel.

Kaur's inability to testify about these critical matters clearly prejudiced her defense. Kaur's defense at her second trial turned on her ability to create reasonable doubt as to whether Taneja carried out the murder alone. Likewise, the State's case hinged on proving that Kaur and Taneja planned the murder together. Kaur's testimony would have directly supported her theory of defense and undermined the State's case.

Had Kaur chosen to testify she would have placed herself at risk of being cross-examined with evidence that otherwise would have been protected by attorney-client privilege. The State told the trial court that evidence it obtained during the proceedings on Kaur's motion for a new trial, particularly her admission that she accompanied Taneja to Performance Studios to purchase the solid black wig, would have been "fabulous" evidence in support of its case. The State would not have obtained that evidence but for the proceedings on the motion for a new trial, and Kaur was reasonable to presume

20

> that the State would have an opportunity to use the evidence to impeach her if she had testified at her second trial.
>
> Kaur's inability to testify in her own defense without the threat of privileged evidence being used by the State on cross-examination was prejudicial. The Appellate Court's failure to recognize this clear prejudice to Kaur's Sixth Amendment right was objectively unreasonable. Kaur reiterated her argument to the trial court on multiple occasions over several years leading up to and during her second trial.

Id. at 608–12 (citation modified). The Fourth Circuit then remanded the matter for de novo review with the following instructions:

> Having concluded that the Appellate Court's determination of the facts was objectively unreasonable, and that Kaur was prejudiced by what the Appellate Court assumed to have been a violation of her Sixth Amendment rights, we remand to the district court to determine in the first instance whether there was indeed a violation of the Sixth Amendment.
>
> On remand, however, [the Antiterrorism and Effective Death Penalty Act's ("AEDPA")] formidable limitations give way. AEDPA permits a federal court to bypass § 2254(d)'s limitations on relief when a state court has refused to adjudicate a procedurally proper claim on the merits. Because the Appellate Court never reached the merits of Kaur's Sixth Amendment claim, federal habeas review on that issue is not subject to the deferential standard that applies under AEDPA to claims that were adjudicated on the merits in the state court proceeding. Thus, the district court must review de novo the question of whether a constitutional violation occurred.

Id. at 612–13 (citation modified).

On remand, the Court set deadlines for Kaur to amend her Petition, for Respondents to file an Answer, and for Kaur to Reply. (Sep. 25, 2025 Order at 3, ECF No. 59). The Court directed the Parties to address certain issues in their briefs:

> (1) Authority for the existence or absence of a Sixth Amendment constitutional right to attorney-client privilege;

21

(2) Whether Kaur waived her Sixth Amendment right under the circumstances, whether the waiver was constitutionally sufficient, and the extent of the waiver; (3) Once the trial court granted Kaur's motion for a new trial, whether the Constitution required the trial court to protect Kaur's Sixth Amendment right to attorney-client privilege, and if so, how; (4) Whether any action(s) violated Kaur's Sixth Amendment rights; and (5) What standard Kaur must meet under the circumstances to obtain relief for a Sixth Amendment violation, and whether that standard has been met.

(Id. at 2). Kaur filed a First Amended Petition on October 10, 2025 (ECF No. 62). Respondents filed an Answer on December 10, 2025, (ECF No. 70), and Kaur filed a Reply on January 9, 2026, (ECF No. 75).

## II.   DISCUSSION

### A.   Standard of Review

The Fourth Circuit has directed this Court to "review de novo the question of whether a constitutional violation occurred." Kaur, 151 F.4th at 608.

### B.   Analysis

On remand, the issue before the Court is limited to Ground One of Kaur's original Petition: whether Kaur's Sixth Amendment right to counsel was violated when prosecutors with full knowledge of her attorney-client privileged communications and attorney work product conducted her second trial. (Pet. at 43; First Am. Pet. Writ Habeas Corpus ["Am. Pet."] at 13, ECF No. 62); Kaur, 151 F.4th at 613. Kaur argues that the Sixth Amendment recognizes a right to privileged attorney-client communications, that she need not show that this right is "clearly established Federal law" to prevail on de novo review, and that the prosecution's access to and use of privileged materials at her retrial, considering the

22

breadth of the materials disclosed, prejudiced her. (Am. Pet. at 11–20). In anticipation of Respondents' waiver argument, Kaur also asserts that her attorney-client-privilege waiver was limited and did not extend to her retrial. (Id. at 27–28). As relief, Kaur requests an unconditional order of release. (Id.).

Respondents counter that Kaur's claim is not cognizable for federal habeas review. (Answer at 27–28). On the merits, Respondents contend that Kaur expressly waived her attorney-client privilege during the state court proceedings on her Motion for a New Trial. (Id. at 33–37). Respondents also argue that the trial court's protective order was sufficient to protect Kaur's rights such that the prosecution team need not have been disqualified from the retrial, and that the record does not reflect that the prosecution team violated the protective order at Kaur's retrial because Kaur did not object. (Id. at 38–42). Finally, Respondents oppose Kaur's request for an unconditional order of release, arguing that in the event of habeas relief, a conditional writ is appropriate. (Id. at 42–43).

### 1.    Is Kaur's Claim Cognizable?

To begin, the Court will address Respondents' argument that Kaur's claim is not cognizable in federal habeas review because attorney-client privilege is a matter of state law. (Id. at 27–28). As the Court explained in its April 25, 2025 Memorandum Opinion, the Supreme Court acknowledged in Weatherford v. Bursey, 429 U.S. 545 (1977), that the Sixth Amendment encompasses the attorney-client privilege:

> There being no tainted evidence in this case, no communication of defense strategy to the prosecution, and no purposeful intrusion by Weatherford, there was no violation of the Sixth Amendment insofar as it is applicable to the States by virtue of the Fourteenth Amendment.

(Apr. 15, 2025 Mem. Op. at 21 (quoting Weatherford, 429 U.S. at 558)). This Court also concluded that "every Circuit that has applied Weatherford in the attorney-client privilege context has interpreted it as extending a Sixth Amendment right." (Id.). The Fourth Circuit is one such circuit that recognizes that the Sixth Amendment encompasses the attorney-client privilege, and it created the following framework for establishing such a claim:

> In determining whether there has been an invasion such as to be violative of the Sixth Amendment right to effective assistance of counsel, four factors must be considered. They include: (1) whether the presence of the informant was purposely caused by the government in order to garner confidential, privileged information, or whether the presence of the informant was a result of other inadvertent occurrences; (2) whether the government obtained, directly or indirectly, any evidence which was used at trial as a result of the informant's intrusion; (3) whether any other information gained by the informant's intrusion was used in any other manner to the substantial detriment of the defendant; and finally, (4) whether the details about trial preparation were learned by the government.

United States v. Brugman, 655 F.2d 540, 546 (4th Cir. 1981). Respondents concede that a federal constitutional claim under Brugman "would be a cognizable basis for federal habeas corpus relief." (Answer at 30). They argue, however, that such a claim is "flatly meritless" because the State did not "intrude" upon Kaur's attorney-client privilege. (Id. at 27). As explained in Subsection II.B.3 below, this Court disagrees.

Respondents also argue that Kaur's claim is not cognizable because "[q]uestions as to the scope of a waiver of attorney-client privilege in state court are . . . matters of state law," and "Kaur cites to no case in which a federal court has reviewed a state court's ruling

on the scope of a waiver of attorney-client privilege as an issue of federal constitutional law." (Id. at 33). Respondents appear to suggest that Kaur is not entitled to relief because her claim is not based on "clearly established Federal law" under 28 U.S.C. § 2254(d)(1). But the Court need not make such a finding. The Fourth Circuit held that the Appellate Court's decision was "objectively unreasonable in light of the record before the Appellate Court," Kaur, 151 F.4th at 608, a conclusion that coincides with § 2254(d)(2), not § 2254(d)(1), see 28 U.S.C. § 2254(d)(2) (permitting federal court to grant application for writ of habeas corpus when state court decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding"). The phrase "clearly established Federal law" does not appear in § 2254(d)(2), nor does it appear in the general standard for habeas relief under § 2254(a). See 28 U.S.C. § 2254(a) (allowing district court to "entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States").

Thus, to the extent Weatherford is not "clearly established Federal law," and to the extent that Kaur's claim does not fit squarely into the situation addressed in Weatherford or Brugman, Kaur is not prevented from obtaining habeas relief, because all she must show is that she is in "custody in violation of the Constitution or laws . . . of the United States." 28 U.S.C. § 2254(a); see Alexander v. Williams, 641 F.Supp.3d 1082, 1101 (D.Colo. 2022) ("The Court elects to take up the 2254(d)(2) inquiry first and, because it finds that 2254(d)(2) does not bar relief, it need not address whether the state court's ruling was an 'unreasonable application of . . . clearly established federal law' under § 2254(d)(1)."

(quoting Brumfield v. Cain, 576 U.S. 305, 312 (2015))); Alvarez v. Montgomery, No. SACV 15-0987-DMG (KS), 2022 WL 868889, at *25 (C.D.Cal. Jan. 27, 2022) (holding that absence of clearly established federal law regarding prosecutor's unknowing use of false testimony as sufficient to prevail on a Napue claim did not preclude federal habeas relief for that claim where the state court had made an unreasonable determination of the facts under § 2254(d)(2)), report and recommendation adopted, No. SACV 15-00987-DMG (KS), 2022 WL 860804 (C.D.Cal. Mar. 23, 2022); Greer v. Comm'r of Conn. Dep't of Corr., No. 3:20-cv-1568 (JAM), 2020 WL 6806161, at *4 (D.Conn. Nov. 18, 2020) ("[R]elief may lie under § 2254(d)(2) . . . if this unreasonable determination of the facts results in turn in a violation of federal law . . . . [S]uch a violation includes even federal rights . . . that have not risen to the particularity and prominence to qualify as clearly established law of the United States Supreme Court."); Lewis v. Ortiz, No. 05-5832 (FLW), 2007 WL 1467162, at *17 n.7 (D.N.J. May 11, 2007) ("As sections 2254(d)(1) and (d)(2) are in the disjunctive, a petitioner who satisfies §§ 2254(d)(2) . . . need not also satisfy the unreasonable application clause of § 2254(d)(1), but need show only that he is in custody in violation of the Constitution, laws or treaties of the United States."). The Court, therefore, finds that Kaur's claim is cognizable.

## 2.      Did Kaur Waive Her Attorney Client Privilege for Her Retrial?

Next, Respondents argue that Kaur waived her attorney-client privilege by virtue of raising an ineffective assistance of counsel claim and that the waiver was unlimited in scope and, thus, extended to her retrial. (Answer at 5–8). This Court disagrees.

The United States Supreme Court considers it "intolerable" to require a criminal defendant to surrender "one constitutional right . . . in order to assert another." Simmons v. United States, 390 U.S. 377, 394 (1968). To that end, the United States Court of Appeals for the Ninth Circuit explained in Bittaker v. Woodford, 331 F.3d 715 (9th Cir. 2003), that fairness demands that the waiver of a litigant's attorney-client privilege for purposes of an ineffective assistance of counsel claim be no broader than is necessary to litigate that claim. Id. at 722–23. Requiring that a litigant enter a broad waiver that extends to a potential retrial would "violate the spirit, and perhaps the letter, of [Simmons]." Id. at 723; see also United States v. Nicholson, 611 F.3d 191, 217 (4th Cir. 2010) (adopting Ninth Circuit's analysis in Bittaker); United States v. Khan, 309 F.Supp.2d 789, 800 (E.D.Va. 2004) (finding that a defendant who brings an ineffective assistance of counsel claim impliedly waives their attorney-client privilege as to any communications related to that claim, but the waiver is limited and does not extend to "any subsequent retrial"), aff'd in part, remanded in part, 461 F.3d 477 (4th Cir. 2006), as amended, (Sep. 7, 2006).

Consistent with Bittaker, the courts in this case treated Kaur's waiver as a narrow one that was limited to the Motion for New Trial proceedings. While the trial court said that it believed Kaur expressly waived her attorney-client privilege (i.e., that the waiver was unlimited), the court proceeded as if Kaur's waiver was limited to the Motion for New Trial proceedings:

> [T]he Court will craft a remedy as though it were an implied waiver in this case . . . as though there had not been an express waiver, notwithstanding the fact that I believe there has been.

27

(Apr. 14, 2016 Tr. 5:7–10 (emphasis added)). The Appellate Court and the Fourth Circuit

also concluded that Kaur's waiver was limited to the Motion for a New Trial proceedings,

even though Kaur filed the affidavit on the public docket:

> The [argument] that is dispositive in our view is that the terms
> of the trial court's protective order was consistent with an
> implied, and not an express, waiver. We conclude that the
> better approach is to treat Ms. Kaur's waiver as an implied one.

Kaur, 2019 WL 2407997, at *14 (emphasis added).

> [B]oth fairness and practicality suggest that we limit the scope
> of the waiver arising out of the filing of the affidavit. The
> circuit court correctly noted that "only the defendant can waive
> the privilege." See Maryland Rule 19-301.6(a) ("[a] lawyer
> shall not reveal information relating to representation of a
> client unless the client consents after consultation, except for
> disclosures that are impliedly authorized in order to carry out
> the representation. . . ."). The court was concerned that treating
> the filing of the affidavit constituted as a comprehensive
> waiver of Ms. Kaur's privilege for all purposes might well
> result in another round of post-conviction proceedings. We
> share that concern.

Id. at *14 n.10.

> Unlike the trial court, the Appellate Court recognized that the
> scope of that waiver was limited. It determined that Kaur's
> motion for a new trial on the basis of ineffective assistance of
> counsel constituted an implied, rather than explicit, waiver of
> attorney-client privilege. Accordingly, Kaur's waiver of
> attorney-client privilege was limited only to the motion for new
> trial proceedings.

Kaur, 151 F.4th at 606 (emphasis added). The Court sees no reason to deviate from the trial court's treatment of the waiver as limited, the Appellate Court's conclusion that the waiver was limited, or the Fourth Circuit's agreement that the waiver was limited.[3]

### 3.      Was Kaur's Sixth Amendment Right Violated?

As to the central issue before the Court, Kaur contends that the State violated her Sixth Amendment right to counsel because the State purposefully acquired all of Kaur's privileged information and prejudiced Kaur by using that privileged information at her retrial. (Am. Pet. at 13–21). The Parties' dispute centers principally on the interpretation of the first Brugman factor:

> whether the presence of the informant was purposely caused by the government in order to garner confidential, privileged information, or whether the presence of the informant was a result of other inadvertent occurrences.

655 F.2d at 546. Respondents argue that Kaur cannot satisfy this factor because the prosecution team lawfully obtained the privileged materials through subpoenas and, consequently, there was no "'wrongful or negligent acquisition of privileged information' by the government" like in Weatherford and Brugman. (Answer at 5, 30–32 (quoting Kaur, 141 S.Ct. at 5 (Sotomayor, J.)). Kaur argues that she does not have to show that the

---

[3] Additionally, Mercer created the handwritten affidavit that was attached to Kaur's Motion for a New Trial at the jail in a rushed manner only hours before the deadline to file the motion. (See July 14, 2015 Tr. (II) 45:2–46:23, 47:6–48:25, 51:7–66:7, ECF No. 23-4). There is no indication that Mercer or Drew explained the waiver to Kaur adequately or that she understood that signing the affidavit could affect her attorney-client privilege at a potential retrial. Thus, the Appellate Court's and the Fourth Circuit's concern that Kaur did not consent to waiving her privilege just because her attorneys filed the affidavit in the record is a valid one.

intrusion into her privileged materials was "wrongful or negligent" to satisfy this factor. (Reply Supp. First Am. Pet. Writ Habeas Corpus ["Reply"] at 7–10, ECF No. 75).

The Court agrees with Kaur that Respondents "graft[] limitations onto the case law that simply are not there . . . ." (Id. at 8). Brugman involved the acquisition of privileged communications via an informant, and so the language that the court used in creating the four factors was tailored to that scenario. 655 F.2d at 546. But the Court does not interpret Brugman as limiting the universe of government behavior deserving of relief to the singular scenario present in Brugman. See, e.g., United States v. Elbaz, 396 F.Supp.3d 583, 588, 591–92 (D.Md. 2019) (stating that a defendant's Sixth Amendment right to "privacy of communication with counsel" may be violated "when the government gains insight into those private communications between attorney and client, through electronic surveillance, an informant, a cooperating co-defendant, or other means"; considering whether defendant's Sixth Amendment rights were violated when government obtained documents via "authorized means," but prosecution had access to "thousands of potentially privileged materials" for about five months due to filtering errors (quoting Brugman, 655 F.2d at 546)); United States v. Allen, 491 F.3d 178, 192 (4th Cir. 2007) (considering whether government "intruded upon attorney work product and violated [defendant's] Sixth Amendment rights" when district court ordered defendant to give government an outline of defense counsel's cross-examination of government witness prior to the witness' testimony).

The core inquiry of the first Brugman factor is whether the government purposely obtained privileged materials. See 655 F.2d at 546 (identifying first factor as "whether the

30

presence of the informant was <u>purposely caused by the government</u>" and finding petitioner did not satisfy this factor because the informant's presence at strategy meetings "was neither induced nor encouraged by the government" (emphasis added)); <u>Elbaz</u>, 396 F.Supp.3d at 592 (stating that first <u>Brugman</u> factor asks "whether the government's intrusion was intentional 'in order to garner confidential, privileged information" (quoting <u>Brugman</u>, 655 F.2d at 546)). The Court does not read <u>Brugman</u> or <u>Weatherford</u> as requiring a finding that the government obtained privileged materials by wrongful or improper means to find that the government purposely obtained such materials, simply because those cases involved improper conduct.[4]

Evaluating the <u>Brugman</u> factors in this case requires a discussion of the nature of the trial court's protective order and the prosecution's use of privileged materials at Kaur's retrial. Kaur moved for a protective order after the trial court granted her a new trial, seeking to disqualify the prosecution team and to prohibit the State from using any privileged information at the retrial. (State Ct. Rec. Vol. II at 13–35). In opposing the protective order, the State repeatedly assured the trial court that it had no intention of using the information it received from the OPD subpoenas at Kaur's retrial. (<u>Id.</u> at 36–57). The

---

[4] The Court also notes that <u>United States v. Brugman</u>, 655 F.2d 540 (4th Cir. 1981), requires that the four factors be <u>considered</u> when evaluating whether a Sixth Amendment violation occurred, not that all four be strictly satisfied. <u>Id.</u> at 546. The third factor, prejudice, is the only factor that courts applying <u>Brugman</u> recognize as a factor that a petitioner <u>must</u> satisfy. <u>See id.</u> at 546; <u>United States v. Chavez</u>, 902 F.2d 259, 266 (4th Cir. 1990) ("[I]t is well settled that some showing of prejudice is a necessary element of a Sixth Amendment claim based on an invasion of the attorney-client relationship."); <u>United States v. Elbaz</u>, 396 F.Supp.3d 583, 593 (D.Md. 2019) ("[S]ome showing of prejudice is a necessary element of a Sixth Amendment claim." (quoting <u>United States v. Allen</u>, 491 F.3d 178, 192 (4th Cir. 2007))).

trial court apparently took the prosecution team at their word and ordered that "the Government not be permitted any beneficial use of information obtained as a result of the [ineffective assistance of counsel claim]" but declined to disqualify the prosecution team. (Apr. 14, 2016 Tr. 9:20–11:22). The Parties are now at odds about whether the trial court's protective order was sufficient to protect Kaur's rights. Kaur argues that the trial court should have disqualified Ayres and Hall from the retrial, while Respondents argue that the protective order sufficiently protected Kaur's attorney-client privilege. (Reply at 14; Answer at 38–39).

The Court finds that the trial court's protective order did not sufficiently protect Kaur's rights. Given the scope of the disclosures in this matter (over 1,000 pages of documents on defense strategies and discussions), the effectiveness of the protective order depended on the trial court trusting that the prosecution team would not use the privileged materials in Kaur's retrial. Such an order, in an adversarial system, is inherently flawed and cannot adequately protect a defendant's Sixth Amendment rights. As the Ninth Circuit explained in Bittaker, if a litigant prevails on their ineffective assistance of counsel claim, then "the court should aim to restore him to the position he would have occupied, had the first trial been constitutionally error-free." 331 F.3d at 722. Where, as in Bittaker, the government is represented by different attorneys at each stage of the litigation, a protective order that "preclude[es] [the] use of the privileged materials for any purpose other than litigating the federal habeas petition, and bar[s] the Attorney General from turning them over to any other person or offices, including, in particular, law enforcement or prosecutorial agencies," could achieve this goal. Id. at 716–17, 728 (Los Angeles Attorney

32

General's Office litigating habeas petition); see Pet. Writ Habeas Corpus ¶¶ 29(f), 32, 49, Bittaker v. Woodford, No. 2:91-cv-1643 (C.D.Cal. Oct. 15, 1993) (ECF No. 92) (Los Angeles District Attorney's Office litigating trial).

A protective order is not always sufficient, however, as the Fourth Circuit determined in United States v. Nicholson, 611 F.3d 191 (4th Cir. 2010). There, Nicholson sought resentencing due to his attorney's conflict of interest and resulting failure to seek a self-defense-based downward departure during Nicholson's sentencing. Id. at 194–95. The Fourth Circuit concluded, as the district court had not, that Nicholson was entitled to relief and remanded for resentencing. Id. at 215–17. In rejecting the government's position that resentencing would "be a worthless exercise" because Nicholson's attorney had revealed attorney-client privileged information to the sentencing court, the Fourth Circuit held that "Nicholson should be entitled to a protective order prohibiting the Government from using privileged information revealed by [Nicholson's attorney] in litigating Nicholson's actual conflict of interest claim." Id. at 217. Additionally, the Fourth Circuit "direct[ed] the assignment of a new judge for Nicholson's resentencing proceeding" to "minimize[] even a suspicion of partiality" and "preserv[e] the appearance of justice":

> Here, as the Government has underscored, the original judge has expressed the view that lawyer Babineau credibly testified about being advised by Nicholson that he possessed the firearm because of his drug dealing, and not for self-protection. Under Bittaker, however, Nicholson's privileged communications with Babineau could not be admitted in the remand proceedings. Because the original judge "cannot reasonably be expected to erase the earlier impressions from his mind"—or, indeed, "may tend to lean over backwards or overreact in an effort to be fair and impartial"—we are constrained to remand for resentencing by a different judge. In so ruling, we imply no

33

personal criticism of the original judge or his handling of Nicholson's § 2255 proceedings. Rather, we reserve our criticism for Babineau and his failure to recognize and disclose the conflict of interest that prevented Nicholson from enjoying his Sixth Amendment right to effective representation. As such, we equate this matter with those in which the Government has breached a plea agreement and a remand for resentencing by a new judge is essential to preserving the appearance of justice.

Id. at 217–18 (citation omitted).

The Parties in this case were not restored to their original positions, and the retrial was "skew[ed] . . . in the prosecution's favor," because the prosecution team had seen all of Kaur's defense files. Bittaker, 331 F.3d at 722. Even though the prosecution team stated that they would not use it at the retrial, the fact is that they could not erase what they already knew and remembered, even if they did not intend to use, but ultimately did end up using, that information at the retrial. (See Nov. 1, 2016 Tr. 11:1–9 (Ayres stating, "I have all the information in my head . . . I can't, none of us can ever take out what's in our head")). The protective order also left an open question as to whether the State could use Kaur's Hearing testimony at the retrial to impeach her if she took the stand. When a dispute over the protective order arose, the trial court opined that Kaur "made [her] bed" by raising an ineffective assistance of counsel claim. (Nov. 1, 2016 Tr. 13:14–21). But Simmons prohibits the trial court from taking this exact position. See Bittaker, 331 F.3d at 723 ("It is no answer to say that Bittaker created this dilemma for himself—that he was the one who voluntarily 'chose' to challenge his conviction on grounds of ineffective assistance."). And the trial court again relied on the prosecution team's assurances of professionalism

34

when Kaur objected to the use of her testimony for trial preparation. (Nov. 1, 2016 Tr. 13:10–14:17).

This is not to say that disqualification of the prosecution team is required in every case where the State is exposed to attorney-client privileged information. In this case, the prosecution team had unfettered access to the entire defense file and free rein to cross-examine Kaur about her communications with her trial counsel during the Motion for a New Trial proceedings. The trial court's effort to protect Kaur's attorney-client privilege during the second trial was insufficient because it relied solely on the unenforceable promises of one side of an adversarial process not to use information to which they were already privy and that would give them an advantage at the retrial.

In fact, those promises were not kept. Contrary to Respondents' assertions and the trial court's position that "[a]ny advantage the prosecutor might have had has been substantially, if not entirely, eliminated by the Court's order on" Kaur's Motion for a protective order, the record unquestionably establishes that the State made ample use of the privileged materials in preparation for the retrial. (Answer at 42; Apr. 14, 2016 Tr. 10:16–19). Most notably, the prosecution team learned from the privileged materials and Hearing testimony that there were two wigs, one from CVS and one from Performance Studios. (See, e.g., Aug. 4, 2015 Tr. 72:12–21 (Kaur confirming that she bought a wig from CVS); Hr'g Exs. Pt. 2 at 287 (Mercer mentioning second wig from Performance Studios in email)). The State only discussed one wig in the first trial, and it did not mention CVS or Performance Studios. Indeed, Ayres conceded that she did not have this information

35

during the first trial and that it would have been "fabulous" to argue to the jury in closing argument. (Aug. 14, 2015 Tr. 44:16–23).

From this and other information gleaned from the Motion for a New Trial proceedings, the prosecution team planned an entirely different retrial. The State created a new theme centered on the second wig: "two guns, two wigs, two jackets." (Nov. 1, 2016 Tr. 67:1–9, 69:13, 73:25–74:3). They put on evidence not included in the first trial, including a GPS plot point showing a stop at Performance Studios on the same day that the murder weapon was purchased, (Nov. 2, 2016 Tr. 91:15–92:3; Nov. 3, 2016 239:1–41:10), testimony about what the Performance Studios wig looked like, (Nov. 4, 2016 Tr. 115:8–25, 116:5–17), testimony that the wig in the car was not purchased from Performance Studios, (id. 115:8–21), and testimony that the wig from the car was found inside a Performance Studios package that was inside a CVS bag, (Nov. 3, 2016 (II) 4:7, 24:20–25:13). This evidence supported the State's theory that Kaur and Taneja purchased two disguises because they acted in concert to plan and execute the murder of Preeta Gabba. Also noticeable is the evidence from the first trial that the prosecution team elected not to repeat in the second: Oscar Reyes-Cornajo's testimony that the shooter appeared to have dreads. (July 31, 2014 Tr. 92:14–93:12, 105:5–13). Reyes-Cornajo's testimony damaged the State's new case because the Performance Studios wig was not styled in dreads. (See Nov. 4, 2016 Tr. 115:24–116:8). It is clear from the State's altered strategy and new evidence that the State used Kaur's privileged information at the retrial to bolster their once

weak case against Kaur.[5] The protective order, therefore, was insufficient to protect Kaur's rights and, along with the State's decision not to recuse the original prosecutors, fell short of "preserving the appearance of justice." Nicholson, 611 F.3d at 218; Kaur, 141 S.Ct. at 5 (Sotomayor, J.) ("The prosecutors, too, had a choice. And in making that choice, as with all prosecutorial decisions, those lawyers acted as 'the representative[s] not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" (quoting Berger, 295 U.S. at 88)).

At bottom, the Court finds that Kaur's Sixth Amendment rights were violated. At their core, the Brugman factors ask whether the government intentionally obtained privileged information, whether the government used that information at the defendant's trial, and whether the defendant was prejudiced by the government's actions. 655 F.2d at 546. In this case, the prosecution team was subject to a protective order that in both letter and spirit prohibited the use of information contained in attorney-client privileged materials and testimony to which the prosecution became privy as a result of Kaur's ineffective assistance of counsel claim. (Apr. 14, 2016 Tr. 9:23–10:5 (trial court ruling that it will "prohibit the State from making any use of any attorney/client communication between the

---

[5] Respondents argue that Kaur failed to develop the factual basis of her claim during her state court proceedings by failing to object at the retrial. (Answer at 41). The Appellate Court, however, unequivocally rejected the State's argument that Kaur was required to object during the retrial to preserve an argument that she made, and that the trial court rejected, prior to the retrial, Kaur v. State, No. 2516, Sep. Term, 2106, 2019 WL 2407997, at *8–9 (Md.Ct.Spec.App. 2019), and this Court agrees.

defendant and her attorney, as well as making any use of the affidavit that was filed in this case")). They did so anyway. As discussed above, the situation is proof-positive that the scope of the protective order in this case was insufficient to protect Kaur's Sixth Amendment rights.

The Fourth Circuit already concluded that Kaur was prejudiced by the prosecution team's access to and use of privileged materials at the second trial because: (1) evidence of the second wig, "which the State learned of through attorney-client privileged materials[,] . . . helped the State address Kaur's admittedly weak motive by connecting her to Taneja," and (2) "the trial court reserved judgment on whether the State could use the testimony it obtained from Kaur's motion for a new trial hearing to cross-examine her at the second trial" and, consequently, precluded Kaur from "testify[ing] in her own defense without the threat of privileged evidence being used by the State on cross-examination . . . ." Kaur, 151 F.4th at 610–12. This Court is bound by the Fourth Circuit's finding of prejudice on remand. See Hannah P. v. Haines, 80 F.4th 236, 246 (4th Cir. 2023) ("According to the law of the case doctrine, the factual findings and legal conclusions made by an appellate court generally bind all subsequent proceedings in the same case.").

In sum, the prosecution team purposefully obtained Kaur's attorney-client privileged information from the Motion for a New Trial proceedings and used that information at Kaur's retrial to her prejudice, satisfying the Brugman factors. Therefore, the Court finds that Kaur's right to effective counsel under the Sixth Amendment was violated when her second trial was conducted by prosecutors with full knowledge of her

attorney-client privileged communications and attorney work product. Accordingly, the Court will grant Kaur's Amended Petition.

## C.      Remedy

As to the remedy, Kaur suggests that an unconditional release order is the only appropriate remedy because the taint created by the prosecution team's use of her attorney-client privileged materials cannot be cured any other way. (Am. Pet. at 27–28). Respondents argue that a typical conditional writ is appropriate. (Answer at 42).

"[A] federal habeas court possesses substantial discretion in fashioning an appropriate remedy," but "preventing the retrial of a state criminal case is the strongest of medicine." Wolfe v. Clarke, 718 F.3d 277, 288 (4th Cir. 2013). "[I]t is a measure that should be utilized with the utmost restraint, only in the most extraordinary of circumstances," "and will ordinarily be limited to situations where a recognized constitutional error cannot be remedied by a new trial." Id. at 288, 290; see also Braden v. 30th Jud. Cir. Ct. of Ky., 410 U.S. 484, 489 (1973) (explaining that "special circumstances" must exist for a federal court to exercise its habeas corpus power to stop a state criminal proceeding).

Comity demands that the Court provide the State with the opportunity to cure the constitutional violation. The Court will not presume that the State cannot craft necessary and sufficient guardrails to protect Kaur's attorney-client privileged communications and materials upon retrial.[6] This is especially true considering the Court's explicit ruling today

---

[6] Other than granting the writ of habeas corpus and imposing time limits in which the State must either release Kaur or correct the problem, the precise remedy is generally

that the trial court's previous efforts did not go far enough to protect Kaur's Sixth Amendment rights. Accordingly, the Court denies Kaur's request and will issue a conditional writ.

### III.    CONCLUSION

For the foregoing reasons, the Court will grant Kaur's Amended Petition (ECF No. 62). The case is remanded to the Circuit Court for Montgomery County for a new trial. This Court's judgment will be stayed for thirty (30) days to allow for an appeal or, absent an appeal, a decision by the Circuit Court for Montgomery County concerning Kaur's continued confinement. A separate Order follows.

Entered this 8th day of July, 2026.

_____/s/_____
George L. Russell, III
Chief United States District Judge

---

left to the State. <u>Bastida v. Braniff</u>, 444 F.2d 396, 398 (5th Cir. 1971) ("It goes without saying that a federal court should not become involved in the judicial administration of the state court system if any reasonable alternative exists by which adequate relief can be afforded."). Thus, it is not appropriate for this Court to dictate a specific manner through which to cure the constitutional violation. <u>Smith v. Lucas</u>, 9 F.3d 359, 367 (5th Cir. 1993).